LEMP HUNTING & FISHING CLUB, Appellant, v. JOHN H. HACKMANN et al., Respondents.

St. Louis Court of Appeals, April 8, 1913.

1. **APPELLATE PRACTICE: Conclusiveness of Findings of Fact: Equity Case.** In an equity case, it is the duty of the appellate court to review and weigh the entire evidence, and while deference may be given to the findings of the lower court, they are not binding.

2. **FRAUD AND DECEIT: Sufficiency of Evidence.** In an action by a lessee for specific performance of an agreement contained in a lease whereby the lessor agreed, at the option of the lessee, to renew the lease, defended on the ground that the execution of the lease was induced by the fraud of the lessee, *held* that the evidence failed to establish fraud.

3. **CORPORATIONS: Ultra Vires: Estoppel: Specific Performance.** One who deals with a corporation as such, receives its money and undertakes or contracts to convey lands to it in its corporate name, is estopped to deny either the validity of the corporation or its power to receive the grant, and hence a plea of *ultra vires*, under such circumstances, would not constitute a defense to an action by a corporation for specific performance of an agreement to renew a lease.

4. **CONTRACTS: Mutual Mistake.** Where a contract of lease, as executed, is in the form and contains the provisions that the parties intended, the fact that the lessee may have intended to only partly exercise the rights acquired under it, or that the lessor understood he would only partly exercise them, would not establish that there was a mutual mistake and thus defeat the contract.

5. ——: ——: **Evidence.** In order to defeat a contract on the ground of mutual mistake, the evidence with respect thereto must be clear, cogent and convincing.

6. ——: **Presumption of Knowledge of Contents: Evidence.** The presumption that parties to a contract knew what they signed is not to be lightly overthrown, where they were *sui juris*, could read, and were in full possession of their mental faculties at the time.

7. **SPECIFIC PERFORMANCE: Nature of Remedy.** Specific performance is not a matter of absolute right, but is one somewhat of grace, resting in the sound discretion of the court, to be exercised, however, not arbitrarily or capriciously, but according to established rules and principles.

8. ——: **Grounds of Denial: Hardship.** Specific performance may be denied, even where no fraud or mistake appears, if to grant it would inflict such a burden or hardship upon the defendant as to be inequitable and unconscionable.

9. ——: ——: ——. In determining whether or not specific performance should be denied on the ground that to grant it would be inequitable, it is not for the court to make a new contract between the parties.

10. ——: **Grounds of Denial: Hardship.** Where a lessee of land for hunting and fishing purposes took an absolute lease for the purpose of protecting its privileges, but never attempted to assert or exercise any right or privilege other than its hunting and fishing privileges, and did not interfere with the use and cultivation of the land by the lessor, and showed no disposition of doing so in the future, specific performance of an agreement to renew the lease would not be denied on the ground that it would be inequitable or involve hardship.

Appeal from Lincoln Circuit Court.—*Hon. James D. Barnett*, Judge.

Reversed and remanded (*with directions*).

*Wm. A. Dudley* and *Eugene Buder* for appellant.

(1) The appellant had full authority to hold the land under the lease in question. Constitution of Missouri, art. 12, sec. 7; Sec. 3443, R. S. 1909; Sec. 2990, R. S. 1909; Aschenbroedel Club'v. Finlay, 53 Mo. App. 256. (2) Even if appellant had no right to hold the land, respondents could not raise the question, because the State only can do so. Respondents are in *pari delicto*. Ragan v. McElroy, 98 Mo. 349; Bank v. Mathews, 98 U. S. 621; Drug Co. v. Robinson, 81 Mo. 18; Benevolent Society v. Murray, 145 Mo. 622. (3) Relief in equity on the ground of mistake can only be granted if the mistake is mutual, material and free from negligence on the part of the party seeking the relief. Bispham on Equity (8 Ed.), sec. 191; Grand Lodge v. Sater, 44 Mo. App. 445; Cleghorn v. Zumwalt, 83 Cal. 155; Dougherty v. Dougherty, 204 Mo. 228; Meredith v. Holmes, 105 Mo. App. 352; Benn v. Pritchett, 163 Mo. 572. (4) A court of equity may decree specific performance of a written contract as modified by parol and interpreted by the parties. Bispham Principles of Equity, sec. 382; Pomeroy's Specific Performance, sec. 255-6; 36 Cyc. 786, sec. 2, also, p. 608, sec. 3, notes 57 and 58; Clarke v. Moore, 1 Jones & L. 723; Anderson v. Kennedy, 51 Mich. 467; Ramsbottom v. Gosden, 1 Vesey & B. 165; Gordon v. Hertford, 2 Madd. 106; Jasper County E. R. Co. v. Curtis, 154 Mo. 10. (5) (a) Equity aids the vigilant —not those who sleep on their rights. Respondents were guilty of laches which barred their alleged defenses. Davidson v. Mayhew, 169 Mo. 258-267; Bispham on Equity, sec. 39; Maxfield v. Schwartz, 10 L. R. A. 606, note. (b) The conduct and acquiescence of respondents in accepting the rents and benefits of the lease for ten years, whereby they led appellant to incur large liabilities and spend large sums for improve-

ments, estops them from urging their alleged defenses. Tarkington v. Purvis, 9 L. R. A. note, pp. 607 to 611.

*R. L. Sutton* and *Charles Martin* for respondents.

(1) The defense of *ultra vires* may be made by a private individual in a case of this character. It is only in case of executed contracts that such defense is not permissible. Land v. Coffman, 50 Mo. 243; Dairy Co. v. Mooney, 41 Mo. App. 665; Garrett v. Coal Mining Co., 113 Mo. 339; Chenowith v. Express Co., 93 Mo. App. 195; 5 Thompson on Private Corporations, sec. 5800; 10 Cyc. 1135; In re Ins. Co., 70 Am. St. Rep. 165, and cases there cited; Case v. Kelley, 133 U. S. 21. (2) A court of equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood. What is thus true of mistake is equally true of a defense based upon fraud or surprise. Whenever the defendant's mistake was, either intentionally or not, induced, or made probable or even possible, by the acts or omissions of the plaintiff, then, on the plainest principles of justice, such error prevents a specific enforcement of the agreement. Such co-operation by the plaintiff, however, is not at all essential. A mistake which is entirely the defendant's own, or that of his agent, and for which the plaintiff is not directly or indirectly responsible, may be proved in defense, and may defeat a specific performance. This is indeed the very essence of the equitable theory concerning the nature and effect of mistake. Railroad v. Curtis, 154 Mo. 10; Gottfried v. Bray, 208 Mo. 658; McElroy v. Maxwell, 101 Mo. 306; Grizzler v. Sutherland, 88 Va. 584; Cathcart v. Robinson, 5 Peters, 275; Durrets v. Hook, 8 Mo. 374; Houtp v. Hellman, 228 Mo. 671. (3) The remedy of specific performance is not allowed in cases of fraud or of mistake,

or of hard, biting and unconscionable bargains or where a decree under all the circumstances would be inequitable. Houtz v. Hellman, 228 Mo. 671; Isaacs v. Skrainka, 95 Mo. 517; McElroy v. Maxwell, 101 Mo. 294; Veth v. Gierth, 92 Mo. 97; Durretts v. Hook, 8 Mo. 374; Fund v. Lamb, 152 Pa. St. 529; 34 Am. St. 672; Waterman Specific Performance, sec. 169; Fry Specific Performance, sec. 417; Taylor v. Witham, 45 Mo. 80; Pomeroy v. Tullerton, 131 Mo. 581; McKee v. Higbee, 180 Mo. 263; Real Estate Co. v. Shellbrink, 211 Mo. 710; Ryan v. McLane, 80 Am. St. 438; Railroad v. Rena, 113 Ill. 44; Maspaf v. Minn., 57 N. Y. 158; Gotthelf v. Strauaban, 138 N. Y. 351; Grizzler v. Suthurland, 88 Va. 588; Ruse v. Conrad, 47 Mich. 454; Modisett v. Johnson, 2 Blackf. (Ind.) 439.


ALLEN, J.—Plaintiff is a corporation, incorporated under the provisions of article 10, chapter 33, Revised Statutes 1909. The purposes of its organization, as set out in its constitution, are: "To promote field sports, to encourage the protection of fish and game in the State of Missouri, to encourage rational enjoyment and social amusements among the members of the club by providing debates, reading and other lawful forms of amusement. But this club shall not engage in any business having in view any pecuniary profit of any kind, nor shall it have any connection with any manufacturing, agricultural or mercantile business purpose."

The action is one in equity for specific performance. It is brought to compel the defendants, John H. Hackmann, Hermann H. Hackmann and Herman H. Goos, and Mina Hackmann, wife of John H. Hackmann, and Sophia Goos, wife of Herman Goos, to specifically perform and carry out a covenant for renewal of a certain lease of lands in Lincoln county, which plaintiff had been using for hunting and fishing purposes, and to execute a new lease to plaintiff of said

lands, in accordance with the said covenant contained in the original lease.

The petition avers the corporate existence of plaintiff alleges that on or about May 1, 1900, and at the institution of the suit, defendants John H. Hackmann, Hermann H. Hackmann and Herman H. Goos, were the owners in fee of certain real property described in the petition, and that on or about July 5, 1900, they, together with their said wives, executed to plaintiff a lease to said property for a term of ten years, beginning May 1, 1900, and ending April 30, 1910, at a yearly rental of $37.50, payable annually in advance.

The petition further avers that said lease provided, among other things, that plaintiff, its successors and assigns, was to have the privilege of a renewal thereof for an additional term of ten years, from April 30, 1910, at the same rental therein stipulated. It is then further averred that the lease was duly acknowledged or proved by the aforesaid parties, and duly recorded in the office of the recorder of deeds of said Lincoln county on July 12, 1900. The petition further alleges that plaintiff has complied with all the terms and provisions of the lease on its part; and that, before the expiration of the term thereof, notified the defendants of its willingness to enter into a renewal lease, and that it elected to avail itself of the privilege of renewal contained in the lease, and requested and demanded defendants to execute to it a proper lease to the premises for said renewal term, on the same terms as contained in the original lease, except the renewal thereof, but that defendants refused and continue to refuse to execute the same.

Plaintiff then averred a tender of $37.50 as rental for the first year of the new lease, and the payment of the same into court, to be paid to defendants upon the execution of said new lease to plaintiff; and prayed that the court adjudge and decree that defendants spe-

cifically perform the said covenant for renewal and execute a new lease to said premises to plaintiff, its successors and assigns, for a term of ten years beginning May 1, 1910, and ending April 30, 1920, for the same rentals, and with the same or like covenants and agreements as contained in the original lease, except the renewal clause thereof.

The answer, which is quite lengthy, first denied generally the allegations of the petition. It then states that defendants, John Hackmann, Hermann Hackmann and Herman Goos, at the times mentioned in plaintiff's petition, were and are the owners in fee of the real estate in question, holding title thereto as tenants in common; and that defendants Mina Hackmann and Sophia Goos have no interest therein except their marital rights as the wives, respectively, of defendants John H. Hackmann and Herman Goos.

It is admitted by the answer that the defendants signed their names to the written instrument sued upon; but it is averred that they never agreed to said instrument or to the terms thereof, and that their signatures thereto were obtained without knowledge of its terms on their part, by fraudulent practice of plaintiffs; that prior to the execution of the lease, negotiations were had between plaintiff and defendants with a view to leasing to plaintiff the hunting and fishing privileges upon the premises aforesaid, and that, as a result of such negotiations, it was understood and agreed between the parties that defendants should lease to plaintiff the hunting and fishing privileges thereon for a term of ten years, but that no mention was made of any right to a renewal of the lease to the premises, or that plaintiff was to acquire therein any other interest, right or privilege than that to hunt and fish thereon.

It is then alleged that plaintiff caused the lease to be prepared, and through its agents fraudulently procured the signatures of defendants; that plaintiff's

agents first approached defendant Goos to obtain his
signature, but that the latter was busy and requested
them to first take the same to defendants John H.
Hackmann and Hermann H. Hackmann and procure
their signatures; that thereupon plaintiff's agents
went to defendant John H. Hackmann, and the latter
requested that he be permitted to read the lease; that
thereupon plaintiff's agents pretended to be in a hurry
to return to the city of St. Louis and falsely repre-
sented to the said Hackmann that the lease was satis-
factory to defendant Goos and approved by him, and
that the latter had requested them to say that said
Hackman should sign the instrument as prepared;
that nevertheless said defendant Hackmann insisted
upon reading said instrument, but that one of plain-
tiff's agents, pretending to be in great haste, proposed
to read it to him, and thereupon pretended to do so,
but that, with intent and for the purpose of deceiving
and defrauding said defendant, and of obtaining his
signature to the lease without knowledge of its terms,
failed to read the clause therein granting to plaintiff
the right of renewal of said lease, and incorrectly read
said instrument so as to make it appear to grant only
the privilege of hunting and fishing on the premises,
and further falsely represented to said defendant that
the instrument correctly expressed the agreement
reached between the parties as a result of their prior
negotiations; and that defendant John H. Hackmann,
in reliance upon said false representations, signed his
name to the lease and caused his wife, Mina Hack-
mann, to sign the same.

The answer then alleges that plaintiff's agents
procured the signature of Hermann H. Hackmann by
false representations that defendant John H. Hack-
mann had read and examined the lease, and that he had
requested plaintiff's agents to say to defendant Her-
mann Hackmann that the instrument correctly ex-
pressed what the parties had theretofore agreed upon,

and that defendants Goos and John H. Hackmann fully approved the same; it being averred that plaintiff's agents made the same alleged fraudulent representations concerning the terms of the instrument to defendant Hermann H. Hackmann as they are alleged to have made to John H. Hackmann, and that in reliance thereupon defendant Hermann H. Hackmann signed the same.

The answer then avers that the signature of Herman H. Goos was obtained by falsely representing that defendant John H. Hackmann had fully read, examined and approved the instrument; that defendant Goos still objected to sign it without an opportunity to read and examine it; that plaintiff's agents thereupon fraudulently represented to him that the instrument correctly expressed the agreement between the parties as theretofore made, and fraudulently concealed the fact that it contained a renewal clause, and induced him to sign it upon a promise to furnish him with a copy thereof, promising that if he did not find that the instrument correctly expressed the contract between the parties, then plaintiff would permit the same to be altered to conform thereto; and that, relying thereupon, he signed the lease and caused his wife, Sophia Goos, to sign it.

It is averred that no copy of the lease was ever furnished, and that defendants refused to accept the lease as prepared, written and signed, and refused to accept the rentals reserved therein; and that, upon such refusal, plaintiff promised and assured defendants and agreed with them that the clause in said lease purporting to grant plaintiff the right of renewal thereof should not be binding upon any of the parties and would not be enforced, and that plaintiff would not assert or exercise any greater interest, right or privilege in the premises than the hunting and fishing privilege thereon; and that thereupon defendants received and accepted the rentals reserved in said

lease, and that "the plaintiff used and exercised its hunting and fishing privileges upon said premises, and did not assert or exercise or attempt to assert or exercise any other right or privilege therein during the term of said lease."

Then follow further averments to the effect that plaintiff and its agents knew that said written instrument purported to be an absolute lease of the premises, that it contained a renewal clause, that it gave to plaintiff the right to assign or underlet without the consent of defendants, and it purported to require plaintiff to maintain and repair the buildings and fences thereon, and that it purported to grant to plaintiff the right to construct, maintain or remove such dikes, dams, drains and ditches on the premises as plaintiff might deem proper, and purported to prohibit defendants from diminishing the natural supply of waters thereon and from in any way interfering with the natural drainage to any ponds, lakes or streams on the same; and that plaintiff and its agents well knew that defendants were ignorant of such terms and provisions in the lease, and purposely concealed the same from defendants, and misrepresented to defendants the facts in regard thereto, with intent to defraud defendants and to procure their signatures to the said lease.

The answer then sets up that the rentals reserved in the lease are wholly inadequate to compensate defendants for leasing the premises according to the terms of said lease; that the lands in question are suitable for farming and pasturage purposes, as well as for hunting and fishing; and that an absolute lease thereto, such as the lease in question purports to be, was and is reasonably worth at least $600 per annum; and that the contract as purported to exist by said lease is inequitable and unconscionable.

The answer then sets up the defense of *ultra vires,* averring that plaintiff is a corporation organized un-

der the provisions of article 10, chapter 33, Revised Statutes 1909, and that, as such, has no right or power to take or hold a lease to the lands in question.

A further defense is attempted to be set up, predicated upon the alleged fact that the members of plaintiff club used the land in question for hunting and shooting on Sunday; but as this defense was abandoned at the trial, it need not be further noticed.

It is then further averred that the lands in question lie in the "Mississippi bottom," and that, at the time of the signing of the original lease, a large part thereof was wet, swampy and subject to overflow and unfit for cultivation; but that since that time prices of farm products have greatly increased in value, and that experiments on other lands of like character have demonstrated that, by proper drainage and levees, such lands can be made to yield large profits from crops grown thereon; that plaintiff cannot hold, acquire or operate lands for pecuniary profit, and that the leasing of the premises to plaintiff for an additional term of ten years would prevent defendants during that period from ditching, draining, improving, cultivating, farming, pasturing or otherwise using said lands, and deprive defendants of large profits therefrom, and would be a great hardship and injury to defendants without any benefit to plaintiff; and that a decree for the leasing of said premises to plaintiff for such additional term would be inequitable and unjust.

For reply, the plaintiff denied the allegations of new matter in the answer. And, further replying, the plaintiff alleged that defendants, during the entire term of the lease described in the petition, to-wit, for a period of approximately ten years, accepted the rents and profits paid to them by plaintiff, and fully acquiesced in and consented to the use of the lands by plaintiff; that during said time defendants failed to repudiate the lease or any provision thereof, but on

the contrary led plaintiff to believe that the same was binding on them; that, in reliance thereon, plaintiff entered into other leases for other lands near and adjoining that of defendants, and assumed and incurred large obligations and responsibilities thereby; and that a failure of defendants to renew the lease would make such other lands leased and acquired by plaintiff of little or no value to plaintiff, and otherwise impair the enjoyment and use thereof, to plaintiff's loss. And plaintiff says that defendant should be estopped from setting up the matters and things alleged as a defense to plaintiff's petition.

Replying further, plaintiff pleaded the delay, negligence and laches of defendants, whereby they should, in equity and good conscience, be barred from asserting the matters and things set up by them in defense; and averred that such defense was barred by limitation.

We shall not attempt to rehearse the evidence in detail. Plaintiff made formal proof of its notice to defendants of its election to avail itself of the privilege of renewal of the lease, of its tender to defendants of the rent for the first year of the renewal term and its deposit thereof in court, introduced a copy of its articles of association, the order of court incorporating it and the certificate of the Secretary of State.

Plaintiff placed in evidence the lease of July 5, 1900, by the terms of which defendants fully demised and leased the lands in question to plaintiff for a term of ten years, beginning May 1, 1900, and ending April 30, 1910, for an annual rental of $37.50 "with privilege of renewal for an additional term of ten years at the same rental herein stipulated." The lease then continues as follows:

"And it is further agreed that the said party of the second part, or its legal representatives, may underlet said premises, or any part thereof, or assign this lease without the written assent of the said par-

Fishing Club v. Hackman.

ties of the first part had and obtained thereto; that the said parties of the first part will at all times during the term of this lease, at their own expense (except so far as may be hereinafter agreed to the contrary), maintain and repair all the buildings and fences belonging to said premises, or which may at any time during said term be erected thereon; and it is further agreed by said party of the second part, that if default shall be made in the payment of any rent for a period of two months after the same shall become due by the terms of this lease, that said party of the first part, or his legal representatives, shall be entitled to the possession of said premises, and possession thereof shall be peaceably surrendered by said party of the second part on demand therefor; and the said premises, and every part thereof, in as good repair as they shall be in at the commencement of the term of this lease, will peaceably deliver up to the said parties of the first part, their heirs, executors, administrators and assigns, at the termination of this lease, loss by fire, storm and unavoidable accident, and ordinary wear and tear, and such conditions as may arise from the rights herein granted excepted.

"It is agreed by the parties of the first part that the party of the second part may build, erect, maintain or remove such dikes, dams, drains and ditches on the above described premises as the party of the second part may deem proper. It is further agreed by the parties of the first part that they will not of their own accord, or permit any other person to, diminish the natural supply of water on or to said premises, nor in any way interfere with the natural drainage to any ponds, lakes or streams on said premises."

On behalf of plaintiff it was shown that the rentals for the entire term of the lease from May 1, 1900 to April 30, 1910 had been paid. The evidence disclosed that, for several years prior to the execution of the

lease, plaintiff had exercised the privilege of hunting and fishing over and upon the land in question, under a parol lease or license granted by defendants to plaintiff, the latter paying therefor twenty-five dollars per year; that the exercise of these privileges, under both the prior parol agreement and the lease of 1900, was in connection with a like use by plaintiff of other lands in the neighborhood; and that plaintiff had erected, and maintained, upon a near-by tract of land a clubhouse and certain other improvements, for the use and convenience of its club members.

It was shown that the land in question was of such a character as to be unfit for cultivation to any material extent, was subject to overflow, and fit only for pasturage; that it did not even make good pasture land and that a considerable portion of it was covered with ponds and lakes. It further appeared that, in taking the lease of 1900, the purpose of plaintiff was solely to secure the exclusive hunting and fishing privilege on said lands; but that it was deemed advisable to take an absolute lease of the premises, to fully protect the plaintiff in the exercise of such exclusive privileges, and that the same was not done with any view of ever using said land in any way for profit, nor to prevent defendant from using the same for pasturage, or for any farming purposes to which it was adapted. And it was shown that the plaintiff never in any manner sought to make use of the land, or any portion thereof, for any purpose other than that of hunting and fishing.

Plaintiff's evidence went to show that the clause in the lease giving to plaintiff the right to make, maintain or remove dikes, dams, drains, and ditches on the land in question was intended merely for the purpose of enabling plaintiff to maintain the water in the lakes at the proper stage for hunting at certain seasons of the year, and to prevent ditches being dug that might affect the lakes on this and other lands leased by plain-

tiff. It was shown, however, that plaintiff had not in any way exercised any such rights in and. to the land in question in a way to interfere with its use by defendants for farming or grazing purposes.

Concerning the nature of the land, defendants' testimony did not differ widely from that of plaintiff's witnesses. Defendants admitted that it was subject to overflow, was partly covered by ponds and lakes, and that no attempt had ever been made by them to use it for purposes other than pasturage—that this was the purpose for which they originally purchased it. They testified that it would ordinarily support from eighty to one hundred cattle, from six to seven months of the year; that defendants customarily used it to pasture their own stock, but sometimes pastured other stock thereon at fifty cents each per month. Defendants failed to make any showing that recent experiments in regard to reclaiming other lands of this general character rendered it probable that these lands could practically be made materially valuable for raising crops; the evidence does not disclose that any such attempt has ever been made, or even contemplated, by defendants, and the matter seems to be purely one of speculation.

Upon the issue of fraud in procuring the lease of July 1, 1900, there was much evidence *pro* and *con*, which need not be here reproduced. The facts alleged to have constituted a fraud were set up with much detail in the answer, and on behalf of defendants there was testimony tending, at least to some extent, to support the averments of the answer. The defendant owners of the land testified that they were in turn approached by plaintiff's agents with the prepared lease. John H. Hackmann testified that he signed it because he was told that Goos "had looked over the lease and found everything all right," that it was read to him, but that he did not remember that the objectional clauses were read. He admitted that he

"didn't pay much attention" to the reading of it, but signed it and had his wife sign.

Hermann Hackmann testified that he did not read it nor was it read to him, but that he took the lease and signed it because his brother had signed, and because he was told that the lease was like other leases which neighboring landowners had signed and that Goos was ready to sign it. Goos testified that, when plaintiff's agents approached him in the forenoon of the day in question, he was busy and sent them to John H. Hackmann, and that, when they returned in the afternoon, he was still too busy to read the lease, but signed it and had his wife sign, because he was told that it granted only the hunting and fishing privileges, asking for a copy of it to be sent him, and which plaintiff's agents agreed to do.

The record shows that a copy of the lease was mailed to defendant Goos on April 17, 1901, together with a check for rentals. This defendant claimed that he returned this check to plaintiff, refusing to accept it under the contract. Plaintiff's officers and agents disclaimed even having seen or heard of such letter from Goos, and testified that they never knew of any check being returned. Defendants produced no evidence in this regard beyond the unsupported statement of defendant Goos.

Plaintiff's evidence was to the effect that its agents made known the contents of the instrument to the defendant owners of the land, and that the latter had knowledge of and fully understood its nature and the provisions it contained. Plaintiff's agents denied positively that any false representations whatsoever were made to these defendants who testified concerning the same, and denied that there was the slightest concealment as to the nature and purport of the terms of the instrument. On the contrary, their testimony strongly goes to show that the defendant owners knew fully what the instrument was that they signed.

It appeared that the defendant owners of the land were men of intelligence and well capable of taking care of themselves in business transactions. Defendant Goos, in 1900, was engaged in running a threshing machine and a sawmill; and, besides being part owner of this land, he was a stockholder and director in a local bank. While the Hackmanns testified that their education had been in German, they could both read English, and, from their testimony, appear to be intelligent men, experienced in matters of business.

Further evidence for plaintiff was to the effect that defendants had found no fault with the lease, or any of its provisions, until the question of its renewal arose, and that then the chief insistence was that more rent should be paid by plaintiff than that reserved in the lease.

At the close of the evidence, and in submitting the case below, plaintiff offered to accept a renewal of the lease according to the following suggestion of plaintiff's counsel, viz.: "The court would be bound, in our judgment, to renew the lease according to its terms, but if it should be the opinion of the court that it would be inequitable to decree the renewal of the same according to its literal terms, so that the exercise of the privilege of pasturing and farming the land should depend upon the permission of the plaintiff, then we say it should nevertheless be competent to renew the lease and protect the defendants by an order in the decree reserving to them the right to pasture or cultivate, but not so as to interfere in any way with the rights and privileges of the plaintiff."

In its decree, the trial court made the following findings, viz.: "The court doth find that the lease . . . was procured through its agents by plaintiff from defendants without any fraudulent purpose or intent and without any fraud or deceit whatever. But the court further finds that said lease of 1900 was erroneously written and that by mistake of all the par-

ties thereto said lease did not express the contract actually made and intended to be. made by the parties, in that the renewal of the term of the lease by defendant was not contemplated, and that the lease was so drawn that it constituted a full exclusive lease of the entire premises, when the parties thereto intended that the lease should cover the lands only for an exclusive hunting and fishing privilege, with the right to possession, occupancy, cultivation and general use remaining in the defendants. The court further finds that the lease executed in 1900, would, if renewed, . . . create an unreasonable and unconscionable burden upon the defendants.''

Being of the opinion that it should not undertake to establish the true contract between the parties, the court dismissed plaintiff's bill, and plaintiff appeals.

I. As to the defense of fraud in procuring the lease, we have no hesitation in saying that, from the record before us, we are convinced that plaintiff is not chargeable with fraud in the transaction. This being an equity case it is our duty to review and weigh the entire evidence, though deference may be given to the findings of the chancellor below, who had the witnesses before him. We have very carefully examined and considered the evidence, and our conclusion is that the finding of the lower court as to this issue is clearly right, and that defendants failed to make out a defense on this ground. On the contrary, we are persuaded that the refusal of defendants to renew the lease was not because of any fraud practiced upon them respecting its execution, but that defendants were moved by other considerations in declining to carry out their contract.

II. As to the defense of *ultra vires*: That plaintiff has no right or power under its charter to take and hold this lease upon defendants' lands is set up in the

answer; and the question is ably presented and discussed by learned and diligent counsel for respondents in their brief in this court. We deem it unnecessary, however, to inquire into plaintiff's capacity in this regard, for, as we view the case, this defense is not available to defendants. This for the reason that defendants have dealt and contracted with plaintiff in its corporate name, have recognized plaintiff's corporate capacity to receive the grant in question, and have received and retained the consideration for the contract sought to be enforced.

It is a well-established rule of equity that, where a grantor deals with a corporation, as such, receives its money and undertakes or contracts to convey lands to it in its corporate name, such grantor will be forever estopped to deny either the validity of the corporation or its power to receive the grant. The grantor, having received the consideration, will not be heard to question the corporate capacity of the grantee. [Benevolent Society v. Murray, 145 Mo. l. c. 628, 47 S. W. 501; and cases there cited; West Missouri Land Company v. Railway, 161 Mo. 605, 61 S. W. 847, and cases cited; Ragan v. McElroy, 98 Mo. 349, 11 S. W. 735; 10 Cyc. 1134.]

And the following rule is said to be well settled: "A corporation cannot avail itself of the defense of *ultra vires* when the contract has been in good faith fully performed by the other party, and the corporation has had the full benefits of the performance and of the contract. The same rule holds *e converso;* if the other party has had the benefit of the contract, fully performed by the corporation, he will not be heard to object that the contract and performance were not within the legitimate powers of the corporation." [29 Am. & Eng. Ency. Law (2 Ed.), 50, 51, and authorities there cited.]

The reason and justice of applying the doctrine of estoppel in such case is apparent. Learned counsel

for respondents, however, insist that, in the case before us, the contract sought to be specifically enforced is wholly executory. We are unable to agree with the views of counsel in this regard. Plaintiff is seeking to specifically enforce the covenant of renewal in the lease. By the terms of the instrument the plaintiff agreed to pay $37.50 per year during the terms of ten years provided therein. The record shows that these payments were made by plaintiff, and that plaintiff has fully performed the contract on its part. The payment by plaintiff of the amounts so stipulated to be paid by it was the consideration moving to defendants for all of the rights and privileges granted by them to plaintiff in and by the lease. One of the rights and privileges so granted to plaintiff by the lease was the right of renewal thereof for another period of ten years at the same rental. For this right or privilege which defendants granted it, plaintiff has paid the consideration in full. We think, therefore, that it is altogether a proper case for the application of the doctrine of estoppel. Having executed the lease, and for a period of approximately ten years acquiesced in the exercise by plaintiff of its rights thereunder, and having received the full consideration stipulated to be paid them under the contract, it does not lie in the mouth of defendants to now question the corporate capacity of plaintiff, when the latter is seeking to specifically enforce one of the covenants therein, which defendants bound themselves to perform.

III.    Learned counsel for respondents further urge upon us many equitable rules and doctrines, which they say would be violated were the contract before us specifically enforced. To state the contentions of counsel in this regard would be to unduly extend this opinion. It is sufficient to say that we have carefully reviewed and considered all of them, but we are not thereby persuaded that plaintiff should be denied re-

lief. In fact since (as we hold) defendants have not
made out the defense of fraud which they plead, and
since (as we further hold) the defense of *ultra vires*
is not available to them, the defenses set up by de-
fendants, and upon which they stood below, are swept
away—unless, indeed, it be the plea of defendants
that, owing to unforseen contingencies arising since
the execution of the contract, specific performance
thereof would be such an unreasonable and unconscion-
able hardship upon the defendants as to deter a court
of equity from enforcing it.

IV. The learned chancellor below, finding mis-
take, as he believed, and being of the opinion that he
should not undertake to reform the instrument, and
that it would be inequitable to enforce it as it stands,
dismissed plaintiff's bill. A careful review of the evi-
dence, however, convinces us that the finding that
there was a mutual mistake of the parties is not justi-
fied by the evidence. In equity cases the appellate
court may, and frequently does, defer somewhat to
the findings of the chancellor below, but it is uni-
formly held that the upper court is not bound by such
findings; and this must necessarily be so. [Gottfried
v. Bray, 208 Mo. 656, 106 S. W. 639.] It appears that
the trial court was of the opinion that the written in-
strument did not correctly express the real agreement
theretofore had between the parties, and that it was
executed by them under a mutual mistake as to its
contents. This does not appeal to us as being the
correct view of the transaction. Certainly the evidence
is unmistakable that plaintiff, through its officers and
agents, intended that the contract should be just as it
is. That it was purposely so prepared, and inten-
tionally caused to be executed by plaintiff in the iden-
tical form here sued upon, so plainly appears from
the testimony of plaintiff's witnesses as to place this
question beyond all dispute. Concerning the question

of mutual mistake it is immaterial that plaintiff may have intended to only partly exercise the rights acquired by it under the instrument, and that it may have purposed to permit defendants to make certain use of the lands. It is sufficient that the intention on its part was to have the very identical instrument executed. This being clearly the case, there was no mutual mistake as to its execution.

V. Defendants' theory below proceeded, in fact, not upon the ground of mistake, either mutual or unilateral, but that the execution of the instrument had been procured by false representations upon which defendants relied. But the theory is advanced, that should the court be of the opinion that no fraud was perpetrated on defendants, and that there was not a mutual mistake of the parties respecting the execution of the instrument, nevertheless the facts pleaded and proved show that defendants, in executing the same, acted under a mistake, and that, for this reason, specific performance should be denied, even though their mistake was not induced by plaintiff.

It is unnecessary for us to enter upon a discussion of the authorities bearing upon the effect of such a mistake in an action of this sort, for the reason that, could such mistake be invoked by defendants, and had this been their theory below, we think the evidence insufficient to establish such mistake on their part. Certain it is that the evidence in respect thereto must be clear, cogent and convincing. Here, in our opinion, the evidence falls far short of the required standard. In the face of the countervailing testimony, and in view of all the facts before us, defendants' evidence is not sufficiently convincing to overcome the presumption that they knew what they signed. Such presumption is not to be lightly overthrown where parties are *sui juris,* can read, and are in full possession of their mental faculties at the time. This obtains with

special force here, where the defendants have waited for approximately ten years to repudiate the contract. We are not persuaded that there was mistake, any more than that there was fraud. Indeed, if we accept defendants' version of the transaction, fraud inheres in it, not merely mistake, and there would be no reason to consider the latter.

Here it is again immaterial, so far as concerns the question under discussion, that defendants understood that plaintiff would not undertake to prohibit them from farming and pasturing the land. If they knowingly executed this identical instrument, trusting to plaintiff not to exercise its rights thereunder so as to deprive them of the use of the land, then there was no mistake with respect to its execution. There is no question before us as to any abuse of the trust and confidence thus reposed in plaintiff.

VI. The court below was of the opinion that to renew and extend the lease for an additional period of ten years would create an unreasonable and unconscionable burden upon the defendants. It is a time-honored rule of equity that specific performance is not a matter of absolute right, going as of course, but one somewhat of grace, and resting in the sound discretion of the court, to be exercised, however, not arbitrarily or capriciously, but according to established rules and principles. It is equally well established that even where no fraud or mistake appears, specific performance may be denied, where to grant it would inflict such a burden or hardship upon the defendants as to be inequitable and unconscionable.

It remains for us to determine whether, under the facts of this case, specific performance of the covenant of renewal should be denied plaintiff because of the alleged hardship thereby inflicted upon defendants. It is not for the courts to make a new contract for the parties. This has been universally condemned.

We are not called upon to reform the instrument sued upon; and plaintiff's offer at the trial in this regard is merely an offer on its part to do equity, if the court should be of the opinion that the case was one in which plaintiff could not equitably insist upon the enforcement of the contract as it stands. We are not of the opinion, however, that to enforce it would entail an unconscionable hardship upon the defendants. The lease, which is sought to be renewed, was in force for approximately a period of ten years. Defendants admit in their answer ''that the plaintiff used and exercised its said hunting and fishing privileges upon said premises, and did not assert or exercise, or attempt to assert or exercise, any other right or privilege therein during the term of said lease.'' There is nothing to indicate that plaintiff purposes to hereafter exercise its rights with respect to the premises in any way more detrimental to defendants than it has in the past.

The record discloses no ground for the professed fears of defendants in this regard. On the contrary, plaintiff's rights not having been exercised in any way so as to interfere with the use of the land by defendants, and no disposition appearing on its part so to do, it seems altogether improbable that defendants' refusal to renew the lease was prompted by any real fear that they would be excluded from the use of the land, or that plaintiff's rights would be exercised to their detriment and loss. Not having suffered injury, and it not appearing that they have reason to anticipate any in the future, defendants cannot expect a court of equity to be greatly moved by the pleas they make. It is significant that it evidently did not occur to them to make complaint in regard to the lease, until called upon to renew it, and then the only demand was for higher rental. That their desire to compel plaintiff to pay more rent caused defendants to attempt to repudiate their written obligation we have little doubt.

Nor, as we have said above, did the evidence disclose that conditions had so changed with respect to these lands, that to renew the lease would be a greater burden to defendants than was the lease itself originally. And we think that the latter cannot be said to have been in any sense a burden, since the evidence shows that defendants made such use of the lands as they desired, and in addition thereto received from plaintiff the rentals for the hunting and fishing privileges. So far as we are able to discover, nothing appears to deter a court of equity from enforcing the contract. There are equities in plaintiff's favor; it has taken leases upon other lands, in connection with this, expended moneys and incurred obligations and responsibilities, in reliance, in part at least, upon its contract with defendants. It has shown no disposition, so far as the record shows, to abuse its privileges, or exercise them to the injury of defendants. And should the plaintiff undertake to use the land for purposes not permitted by its charter, it may be presumed that the State will interfere to prevent an abuse of its corporate powers. And should it exercise any rights under the lease in a manner to justify the interference of a court of equity on behalf of the defendants, the courts are open to them.

For the reasons indicated above, the judgment is reversed and the cause remanded to the circuit court with instructions to enter a decree for plaintiff, specifically enforcing the covenant of renewal in the lease, in accordance with the prayer of plaintiff's petition. *Reynolds, P. J.,* and *Nortoni, J.,* concur.