F. C. Seested v. W. S. Dickey, J. B. Spitcaufsky and Charles Spitcaufsky, Appellants.—300 S. W. 1088.

Court en Banc, December 2, 1927.

*Miller, Camack, Winger & Reeder, Caleb S. Monroe* and *Clarence S. Palmer* for appellants.

*Scarritt, Jones, Seddon & North* for respondent.

198

WALKER, C. J.—This case came to the writer by reassignment. It is a bill in equity to cancel a tax bill against a lot in Jones' Addition to Kansas City for the proportion of the taxes assessed against it for the grading of Main Street.

The appellant Dickey was the assignee and owner of the tax bill; the Spitcaufskys were the contractors to whom the bill was issued. This appeal is from a judgment of the circuit court in favor of the respondent cancelling the tax bill. The subject-matter of this suit is the same as that in Dickey v. Seested, 283 Mo. 167. In that case the tax bill was held invalid because it was made payable in one payment on demand, when, as the court held, it should have been made payable in four installments. · The constitutionality of the provision of the Charter of Kansas City for laying off benefit districts was in that case upheld.

It is contended by the respondent that either one of the three following statutes of limitations bars this action.

First: Section 27, Article 8, of the Charter of Kansas City, provides that when an attempted assessment or issuance of tax bill, etc., shall be held invalid, the Board of Public Works may, at any time within one year, reassess the tracts of land subject to assessment, and evidence the same by tax bills. ·

Second: Section 24, Article 8, Charter of Kansas City, provides that every tax bill upon the date of its certification to the City Treasurer shall be a lien which shall continue for a period of two years, and no longer.

Third: That the General Statute of Limitations, Section 1317, Revised Statutes 1919, applies. It limits the commencement of an action upon a liability created by the statute, etc., to a period of five years. The right to a tax bill arose when the first tax bill was issued, June 8, 1915; the present tax bill sued on was not issued and delivered until more than five years thereafter.

It is further claimed that the tax bill is void because under the ordinance, which provided for the grading, the assessment was irrational and unreasonable, and constitutes the taking of property without due process of law, contrary to the Fourteenth Amendment

to the Constitution of the United States, and to Sections 21 and 30, Article 2, of the Constitution of Missouri. While in Dickey v. Seested, supra, it was held that the provision of the charter under which the ordinance was passed was constitutional, it was also held that an ordinance enacted under it might operate so unequally as to be unconstitutional, a question left open by the court in that case. In this connection it is claimed that several tracts of land not included in the benefit districts so as to share in the cost of the grading, were benefited equally with the land included in the district, and should have been made to bear their proportions of the burden of the improvement. These different tracts are shown on plats submitted in the record, and the evidence in relation thereto will be stated more fully later.

On the trial of the case Judge Williard P. Hall, in finding for the respondent, submitted a memorandum stating the reasons for his ruling. He held each one of the so-called statutes of limitations sufficient to bar the action, but he did not consider the merits of the case.

I. Section 27, Article 8, of the Kansas City Charter is as follows: "*Lien for improvements, Invalid by Reason of Irregularities, etc. Reassessment.* Whenever the city, by a valid ordinance, shall have authorized the making of any public improvement to be paid for in special tax bills and shall have entered into a valid contract for such  improvement, and shall have attempted to levy an assessment or issue a special tax bill to pay the cost thereof and said contract shall have been faithfully and fully performed by the contractor, and it shall be made to appear by a judgment of a court of competent jurisdiction or otherwise, that the lien of such assessment or part thereof, or of any or all tax bills evidencing the same, is invalid by reason of any omission, irregularity, defect or invalidity in the acts or proceedings of any of the municipal authorities of the city, relating thereto, the Board of Public Works may, at any time within one year after the original issue of the tax bills, reassess any or all of the tracts of land subject to assessment to pay the cost of such improvement, according to the rule of assessment, and in the same manner and with the same effect and evidence the same by like tax bills as is provided in this article for such assessments in the first instance."

The circuit court held that the foregoing section invalidates the tax bill because the latter was issued more than a year after the date of the original assessment and tax bill.

The appellant urges that a statute of limitations cannot be made the basis for affirmative equitable relief; that it is available only in defense to an action. If appellant is correct it could not apply to

this particular point because the above is not a statute of limitations. It is silent as to when an action may be brought. It can only be said to limit the time within which a second tax bill may be issued for the same work.

The section (Sec. 27, Art. 8, of the Charter) says that when it shall be made to appear that the lien of an assessment, or of any tax bill evidencing the same, is invalid, that: "The Board of Public Works may, at any time within one year from the original issue of the tax bill reassess" the land, "and evidence the same (assessment) by like tax bills" . . . "as" . . . "in the first instance."

Assessment of property for purpose of taxation being the basis upon which tax bills are issued, it must precede their issuance. This court, in the former case (283 Mo. 1. c. 188) in holding the tax bill invalid left the assessment undisturbed, and it is valid unless invalid for reasons which do not affect this particular point.

Because of the manner in which the power is conferred on the Board of Public Works by Section 27, in providing that it "may" reassess, etc., it is contended that the maxim "expressio unius exclusio alterius" is applicable in its construction, and the statute is directory only, and does not prohibit reissuance of tax bills after the time mentioned. It is unnecessary to consider the matter in the light of that rule.

It is not claimed that the Board of Public Works (aside from this section and the general statutes of limitations) is limited as to the time in which it may reissue tax bills, where they have been invalid. Plainly the section contemplates a reassessment of the property, and for the purpose of the argument we may treat it as if it expressly forbade such reassessment after one year. It must be construed according to its terms, and if it limits the time in which the city authorities may perform a certain duty, it can apply only to the proceeding mentioned in it. It should not be construed to fix a time for the performance of some act of the city authorities not mentioned, or necessarily contemplated.

That it relates only to reassessments and not to tax bills issued in pursuance of original assessments is shown by other sections of the charter. Section 3, Article 8, provides how assessments shall be made after the assessment of the value of the property by the assessor (Charter, p. 314, Section 3, Article 8); the Board of Public Works "at the time of accepting any improvement . . . shall make and levy an assessment against the tracts of land, exclusive of improvements, to be assessed" (Sec. 4, Art. 8). After this assessment and apportionment are made, tax bills are issued and delivered to the contractor and certified to the city treasurer. Section 27 relates literally to the issuance of "like tax bills;" that is, tax bills on a reassessment "like" those issued on the original invalid assess-

ment. The present tax bills are not "like" the original tax bills, because payable in installments. The section, in mentioning the tax bills held invalid, contemplates an invalidity on account of some irregularity in the "acts or proceedings" which authorized them, not an invalidity on account of the form of the tax bills as in this case.

There is a reason why the assessment should be made immediately after the improvement. The property in the benefit district is assessed in proportion to its actual value. Under Section 3, the City Assessor is required to make an assessment of the value of the land, and the Board of Public Works is required to act upon the assessment at the time of accepting the improvement. The actual value might change greatly in a short time; an assessment at some subsequent time might involve embarrassment in ascertaining the value of the property at the time the work was done. That affords a reason why there should not be a reassessment after the expiration of a year from the time of the first issuance of tax bills. Whether this is a sufficient reason or not, the framers of the charter may be presumed to have had a reason for requiring reassessments to be made within a year. That, however, does not affect the right to issue the tax bills. If the restriction on the right to reassess the property after a period of one year be construed to affect the right to issue tax bills upon the original assessment after that time, that construction would read into the charter a provision not expressed nor necessarily implied by its terms.

Further than this, the contractor does not issue the tax bills, nor control their issuance. Suppose for any reason the city authorities should refuse to reissue tax bills. If it were determined to contest the matter difficulty would be encountered in resorting to a legal proceeding by which the contractor could compel their reissuance within a year. It should not be held that the city authorities, by a failure to perform an act over which the contractor has no control, can deprive him of his right of recovery and invalidate the tax bills. That section of the charter should not be so construed as to extend its meaning beyond its express terms. We hold, therefore, that a valid tax bill may issue upon an assessment made more than a year prior to its issuance, although an invalid tax bill was issued upon the assessment more than a year before.

II. It is further contended that Section 24, Article 8, operates to invalidate the tax bill because it says every tax bill issued under the provisions of this article shall be a lien upon the land described therein, "upon the date of the certification thereof to the City Treasurer," and "such lien shall be continued for two years thereafter." Section 24, like the section just considered, is not strictly a statute of limitations.

It limits the time during which the lien of a tax bill shall continue, and suit cannot lie to enforce a tax bill after the lien has expired. In this case the suit was brought within a few days after the issuance of the present tax bill and the literal application of that section to the case would bring the suit within the duration of the lien. In discussing this point, here urged by respondent, Circuit Judge HALL, said: "Let us exclude the original tax bill and treat the matter as if such bill had never been issued and treat the tax bill in suit as the original."

Of course, if we ignore the time of issuance of the bill and arbitrarily fix that time five years earlier, it is easy to see, notwithstanding the provision for payment in installments, that the lien would have expired. We cannot, however, thus arbitrarily rearrange the calendar and the record. If this tax bill is valid the lien would continue for two years after its date, this suit having been brought within a few days after its issuance and delivery. It remains, then, to determine only whether the city has a right to issue it, and if it had the lien attached.

In this connection the controversy turns upon the time when the lien begins. Section 24 says, as quoted, that the lien of the tax bill begins "upon the date of the certification thereof to the City Treasurer." If that be construed to mean what it says, then the tax bill could not be a lien until it was issued and certified to the City Treasurer. Manifestly a tax bill cannot be a lien until there is a tax bill. The respondent contends, however, that the charter requires a certification to the City Treasurer of only the apportionment and assessment, and does not require a certification of the tax bill as such to the City Treasurer, and that therefore Section 24 means that the lien of the tax bill shall begin from the time the apportionment and assessment are certified to the City Treasurer. This apportionment and assessment was certified five years before, therefore the lien of the present tax bill expired three years before it came into existence. This argument can only be rendered tenable by assuming that there was never any prior tax bill, and that the present tax bill was issued five years before its date.

Other sections of the charter may properly be considered in determining whether Section 24 is to be given the meaning attributed to it by respondent.

Section 1, Article 8, of the City Charter provides that the city shall have power to make public improvements, "and to make, levy, assess and collect special assessments to pay therefor, and to issue special tax bills as evidence of such assessments."

Section 3, Article 8, of the Charter, provides that "in making assessments for special tax bills to pay for grading," etc., "the city assessor shall, on demand of the Board of Public Works, cause an

assessment to be made of the value of all the lands to be charged with the cost of grading, and the Board of Public Works shall apportion the cost of the improvement among the several lots or parcels of land to be charged according to the value thereof, fixed by the said assessor, and charge each lot or parcel of land with the proper share of such cost.''

Here we have ''assess'' and ''assessment'' with two different meanings. To assess property is to place a value upon it, and to assess a tax is to fix or settle the amount to be levied upon the property, [Bridewell v. Morton, 46 Ark. 1. c. 78; Moss v. Hindes, 28 Vt. 1. c. 281.]

Under Section 3, the assessor assesses the value of the land. He places a value upon each tract of land which the Board of Public Works lists to him for that purpose. Then the Board of Public Works, as required by Section 1, proceeds to assess the taxes; having the entire cost of the public work before it, it apportions the cost among the several lots in the benefit district in proportion to their actual value in the manner provided by the charter. That is what the Board of Public Works does in order to fix the amounts to be paid by each land owner affected, and tax bills are then issued as evidence of that assessment.

· What is certified to the City Treasurer? Section 22 of Article 8 of the City Charter says: ''As soon as the cost of any public work payable in special tax bills . . . has been assessed against the several tracts of land chargeable therewith the Board of Public Works shall, at the time of delivering the tax bills to the contractor or his assignee entitled thereto, certify such apportionment and assessment to the City Treasurer.''

The respondent calls attention to the fact that this is the only section of the charter which in direct terms requires the Board of Public Works to certify anything to the City Treasurer, and argues that it requires a certification only of the apportionment and assessment, does not require a certification of the tax bills, and consequently the provision in Section 24, that the lien begins from the certification of the tax bills to the City Treasurer, does not mean what it says, but means that the lien shall begin from the certification of the apportionment.

Three sections of Article 8 of the Charter mention the certification of the tax bills to the City Treasurer. Section 4 provides that the board shall issue ''tax bills to be dated the day when such tax bills and apportionment are certified to the City Treasurer.''

Section 25 mentions it in connection with the installment tax bills.

Section 24 provides that the lien of a tax bill shall begin from its certification to the city treasurer. It follows, therefore, by necessary implication that the tax bill must be certified to the City Treasurer;

otherwise, there is no time fixed for its date and no time stated for the lien to begin.

Besides, the treasurer has certain duties to perform in connection with the tax bill.

Section 23 of Article 8 provides that "the special tax record to be kept by the treasurer shall be complete and full and show all special tax bills."

The section further provides: "Any and all special assessments therein (referring to the treasurer's book) contained, whether arising out of the issuance of special tax bills as in this article provided or by virtue of the verdict or report of juries . . shall be considered for the purpose of collecting and receiving payment thereof as special taxes against any lot or parcel of land."

Section 22 provides that the City Treasurer shall give notice to the parties interested, of the issuance of tax bills against the several tracts of land; the owner of a tract of land may pay the same to the City Treasurer, who in turn shall pay the money to the owner of the tax bill, or if the lot owner should pay the holder of the tax bill, then under Section 24 the paid tax bill must be presented to the treasurer, so that he can enter the payment upon his record, and thus release the lien. All this goes to show that the treasurer must keep a complete and accurate record of the tax bills. If there is any reason why he should have official notice of the assessment and apportionment, there is all the more reason why he should have official information of the issuance and terms of each tax bill, because that is the instrument with which he has to deal. It is not to be supposed that the Board of Public Works must certify the apportionment and assessment to him and then require him to examine the records of the board to obtain the necessary information concerning the tax bills.

Section 23, in the final paragraph, provides that the failure to comply with this and the provisions of the next preceding section (Sec. 22) "shall not vitiate or impair any tax bills." That is to say, if the Board of Public Works fails to certify the apportionment and assessment to the City Treasurer at any particular time, or altogether, it will not vitiate or impair the tax bills. If the failure to certify the apportionment does not impair the tax bill, the lien of the same would attach, notwithstanding there was no certification of the assessment and apportionment. It cannot be said then that the lien must begin only when the certification and apportionment are made. The lien will begin as of the date of the tax bill and its certification, although no certification of the apportionment and assessment has been made by the Board of Public Works.

This is conclusive that the lien of the tax bill begins from the certification "thereof" to the City Treasurer by the Board of Public

Works, and not at any other time. The tax bill must bear the date of such certification, the lien continues for two years from that date, and suit may be begun at any time within that period.

In his memorandum accompanying the judgment Judge HALL said: "Certification of the assessment and apportionment of course describes the tax bills issued in pursuance thereof, and in this sense, and in this sense only, are the tax bills certified to the treasurer."

Suppose that were true. If the certification of the Board of Public Works to the treasurer included a description of the tax bills, then that is a certification of the tax bills as well as of the apportionment and assessment. The apportionment and assessment is one thing, and the tax bill issued as evidence of it is another. If the certificate of the Board of Public Works to the treasurer includes both, then it is exactly the same as if there were two certificates, because both were certified. In order to adopt the construction contended for, of Section 22, we must read out of three sections of the charter all references to a certification of the tax bills to the treasurer by the Board of Public Works. It is much more reasonable to construe Section 22 as in harmony with those sections. By necessary implication the tax bills must be certified to the treasurer. The charter does not anywhere say the apportionment and assessment are a lien in favor of the contractor or his assignee; it is only the tax bill which is declared to possess the power of a lien and this lien begins at the time it is certified to the City Treasurer so that he can make a record of the fact that there was an assessment and apportionment, which the tax bills shows, as well as its other required terms. The tax bill at bar is payable in installments. The apportionment and assessment give no information in relation thereto. Those things are included in the terms of the bill, of which the treasurer must keep a record. The framers of the charter did not intend that the assessment and apportionment should constitute the lien because further steps were to be taken. The lien was not to begin until there should be in the hands of the City Treasurer (the official who could receive payment discharging such lien) a record of the tax bills as evidence of the terms and conditions under which such lien might be enforced or discharged. There is no lien except the lien of the tax bill; the two years' statute therefore does not invalidate the bills in this case.

The record of what was actually done by the Board of Public Works and the treasurer should throw light upon this matter. The respondent offered in evidence the record of the "official proceedings of the Board of Public Works," June 8, 1915. That record shows the acceptance of the work, the finding of the amount to be paid to the contractor, and the amount each tract of land should be assessed and charged for the payment, and contains this order:

"And the Board does hereby make and levy an assessment against the several tracts of land exclusive of improvements, in amount as shown in said document No. 79,206, the aggregate of which assessments equals the amount of the total cost of said improvement.

"The Board further orders the said apportionment and assessment as shown in said document No. 79,206, be certified to the City Treasurer; the tax bills, therefore, according to the apportionment and assessment be made out, certified, registered and delivered to the party in whose favor they are made, and that a receipt be taken of such party in full of all claims against the city," etc.

Respondent also introduced what was called the "Assessment Roll" on file with the Board of Public Works. This showed a list of each tract as fixed by the city assessors, the number of each tax bill issued, and the apportionment of the tax against each tract as evidenced by the tax bill issued against each tract. It gave $5,800 as the value of the land against which the present tax bill was issued. Attached to the roll is a communication dated May 11, 1915, from the Board of Public Works to the City Assessor, directing him to make a valuation of the land involved, and the report of the City Assessor dated June 4, 1915, showing the value of each tract of the land. June 8, 1915, the Board of Public Works issued a certificate, attached to the roll, certifying that it had apportioned the cost of the work of grading Main Street, etc. In addition there is a receipt from the contractor for the tax bills mentioned in the roll.

Except the record noted above, there is nothing to show the certification of anything to the City Treasurer. No records or files of any kind in the office of the City Treasurer were introduced in evidence. Such records and files, if there are any, should properly show what was certified to him and what was kept on his record. The tax bill itself is prima-facie evidence that everything necessary to its regularity was done and we must assume that the treasurer therefore did his duty in the absence of any evidence to the contrary, and had in his files the proper certifications.

The record of the issuance of the present tax bills, June 8, 1920, recites the issuance of a former invalid tax bill, the determination of their invalidity by the Supreme Court, the service of the writ of mandamus upon the Board of Public Works on the previous day, June 7th, and the order of new tax bills to be issued in payment! of the work. Then there is this reference to the former certifications: "This Board having heretofore duly computed the cost of said work and apportioned the same as provided by law and having heretofore certified such apportionment to the City Treasurer as payable in one payment, all as shown on the records of this Board, dated June 8, 1915. . . . It is hereby ordered by the Board that the City Treasurer mark the record of the tax bills for said work, certified to him

under date of June 8, 1915, as invalid and shall refer on said record to the certificate of apportionment for the new bills for the cost of said work, under this date."

"The amounts assessed against the several tracts of land chargeable with the costs of said work, are the same in the apportionment."

By this record the city found its assessment and apportionment to be correct as made in 1915. No valid tax bills were issued upon that assessment. No new assessment was necessary.

It will be noted that the order continues, showing that the tax bills originally were certified to the treasurer under date of June 8, 1915, and therefore the original certification of apportionment was referred to for new tax bills. This order shows the city authorities construed the charter as we have construed it; that the tax bills must be and were certified to the City Treasurer.

III. It is argued by the respondent, and it was so decided by Judge HALL, that the action is barred because the tax bill was issued more than five years after it should have been issued; that the general statute of limitations, Section 1317, Revised Statutes 1919, applies where it states that an action can be commenced only within five years, "upon a liability created by a statute." This is a liability created by a statute in favor of a contractor; the city is under legal obligation to issue tax bills to him in payment for his work. Section 4, Article 8, provides that tax bills shall be issued "in payment" at the time of accepting the improvement. In this case the improvement was completed May 12, 1915, accepted June 8, 1915, and the tax bills issued on that date. Those tax bills being void, no tax bills were issued. The tax bill in the present case is dated June 8, 1915, but was actually issued and delivered July 19, 1920. Section 4, Article 8, requires tax bills to be dated the day they are certified to the treasurer, which in this case is assumed to have been June 8, 1920. The claim is that the actual date of the delivery of the tax bill determines the time when the limitation period would run. That would make more than five years from the time of the issuance of the original tax bills. It is conceded that the right accrued June 8, 1915, the day the work was accepted; on that day the limitation period began. In a case like that the usual rule for calculating time is to exclude the first day and include the last; hence, June 8, 1920, the date of the present bill, would be within the statutory period. It is not necessary to invoke that rule in order to hold that the statute had not run.

What is the particular statutory right or liability created in favor of the contractor in this case? Certainly it is the right to have the tax bill issued, and the city's liability for failure to issue it. The contractor does not issue the tax bill, nor control the machinery of

its issuance. The city, by resistance and prolonged litigation, might prevent the issuance of a tax bill for a period of more than five years from the time the contractor should begin proceedings to enforce his right. In such case it should not be held that he was barred by the failure of the city to perform a duty over which he had no control. What sort of an action could he bring to assert his right to the tax bills? Certainly not a suit on a tax bill not yet issued.

In a well-considered opinion by Judge STURGIS (Likes v. City of Rolla, 190 Mo. App. 140) the Springfield Court of Appeals held that a contractor's remedy is a proceeding by mandamus to compel the issuance of the tax bill. The right to have it issued is the right which gives him his cause of action, a right which expires in five years, under the construction of the statute as contended for by respondent. If, therefore, within five years he brings a correct proceeding to assert his right, then he is not barred by that statute. He preserves his right by asserting it in a legal manner within the statutory period. That was done here. The record introduced recites that on June 7, 1920, within five years from the time the right accrued to the contractor to have a valid tax bill, a writ of mandamus was served on the Board of Public Works commanding it to issue tax bills, including the tax bill in suit. It does not matter now whether the contractor or his assignee, the owner of the tax bill, brought that suit, or whether other persons entitled to tax bills for the same improvement brought the suit on behalf of themselves and others like situated. It was a class suit, evidently brought for the purpose of procuring the issuance of all tax bills which should be issued for the improvements, for the recitals show that in response to the writ of mandamus this tax bill and others were ordered. Here is a definite assertion by a legal proceeding within the statutory period in proper form, of the right to have a tax bill issued.

A case is cited by respondent from the Kansas City Court of Appeals (Moberly v. Hassett, 127 Mo. App. 11), where the right to a tax bill accrued December 15, 1892. The suit was brought on a re-issued tax bill, December 21, 1897, more than five years afterwards. The court said (l. c. 15): "The contractor might have compelled the city to re-issue the tax bills at any time." Some other cases appear where a much longer time than the statutory period of five years elapsed between the acceptance of the work and the issuance of the tax bill. In Riley v. Stewart, 50 Mo. App. 594, the Kansas City Court of Appeals held valid a tax bill issued nine years after the date it should have been issued, though the question of the bar of the Statute of Limitations did not arise in the case.

The case of Bank v. Ridge, 79 Mo. App. 34, shows the liberality of the courts in construing lapses like that complained of here, where it was held the "tardy performance of official duty" by the city would

210

not invalidate a tax bill. In that case the statutory period had not elapsed, but that ruling illustrated the principle suggested above, that the person having a right to a tax bill is not to suffer loss by failure of the city to perform its duty; in such case all he can do is to assert within the statutory period his right to have that duty performed. In this case an action is not barred by the five years' Statute of Limitations.

IV. A consideration of the manner in which the benefit district was laid off is of moment in determining the regularity of the proceeding in this case.

Section 3, Article 8, of the Charter provides for the cost of grading in the following manner:

"In case the land fronting on the street, avenue or public highway, or part thereof, graded, be laid off in lots or blocks property so laid off from the line of the street, avenue or public highway, or part thereof, graded, back to the center line of the block or blocks, shall be so charged, whether fronting on the street, avenue or public highway or not; nevertheless, the Common Council shall have power by ordinance to prescribe that such lands shall not be charged beyond the alleys in such blocks, if deemed just and equitable, and in case any land fronting on such street, avenue or public highway, or part thereof, graded, be not laid off into lots or blocks, then the land not so laid off, and the land in the rear thereof on the line of the street, avenue or public highway, or part thereof, graded, back one hundred and fifty feet, shall be so charged, whether fronting on the street or not; and land liable for such grading shall be charged according to the value thereof, exclusive of improvements thereon, as herein provided."

As we have stated, this court, in Dickey v. Seested, 283 Mo. 167, held the foregoing section to be constitutional, although its application in a specific ordinance might work so unjustly as to be in violation of the Constitution. It is claimed by the respondent that the district to be charged with the cost of the contemplated improvement was "established mechanically and arbitrarily" and is unreasonable, confiscatory and in conflict with the provisions of the Fourteenth Amendment to the United States Constitution, and Section 21, Article 2, and Section 30, Article 2, of the Constitution of Missouri. We subjoin a plat of the district.

The benefit district is indicated as the tract enclosed by heavy straight lines; the double lines enclose "Station Park," the status of which is in dispute; that is, it is disputed whether it was laid off in lots or blocks as contemplated in the section of the charter quoted. Tract A (shaded) is a part of that tract. Another tract, designated as Tract C (shaded), lies just west of the benefit district, north of 25th Street, and south of City View Avenue. These are the tracts which it is claimed were arbitrarily left out of the benefit district, and should have been included so as to equalize the burdens of the improvements. It is important, first, to describe the general situ-

ation: Main Street was graded down so as to form a deep cut along the territory under consideration. It was fifty to sixty feet, or more, below the level of the lots facing it between 25th Street and 24th Street. The evidence shows that the property west of Main Street was more valuable than the property east of that street, rendered so by the establishment and maintenance of the Union Depot on the west. The evidence shows further, without contradiction, that property to the west, left out of the benefit district, was benefited in proportion to its value as much as property to the east of the Main Street included in the benefit district.

There are two grounds of attack upon the benefit district: First, it is claimed that the term ''block'' is interpreted too narrowly in limiting the district on the west side; that a reasonable interpretation of the term as used in the charter would extend those limits. Second, it is disputed that some of the property west of 'Main Street was ''laid off'' in lots or blocks, so as to justify the boundaries of the district on the west. The copy of the plat, as shown, indicates platted streets and alleys to the west which the respondent claims did not exist. The first tract alleged by respondent to have been arbitrarily and improperly left out of the benefit district is Tract A shown on the plat. Two benefit districts have been laid out to pay for two gradings on Main Street, nearly alike in extent, consideration of both of which have been before this court. The tax bill concerned in the first case was here in the case of Commerce Trust Company v. Keck, 283 Mo. 209. The grading in that case did not leave the street as wide nor as deep as afterwards was found necessary. The grading with which we are concerned deepened Main Street eight feet below the former grade, and widened it, taking in adjacent property.

In the Keck case the benefit district south of 24th Street was the same as in the case at bar. The benefit district in that case was exhaustively discussed by Judge Goode, speaking for the court, in which it was held that under the provisions of Section 24, Article 8, of the Charter of 1908, a defendant landowner when sued upon a special tax bill was authorized to plead any mistake or error in the amount of the bill in reduction of the judgment against his land for the particular improvements. By parity of reason, following the ruling in the Keck case, the respondent here, when sued upon this tax bill, while entitled to plead in reduction of the same the omission of lands from the benefit district which should have been included in it, will not be heard to contend that the tax bill is void, because the omission of the lands from the benefit district may properly be classified as ''a mistake''

or error in the amount of the bill referred to in Section 24, of Article 8, and hence affords the landowner ample remedy in suit upon said bill in so far as expressiveness in amount is concerned.

The Keck case and that at bar do not differ in their material facts: these are ample in each case, to enable a fair valuation to be placed upon the omitted tracts. Experts introduced by the respondent, as we shall show more particularly later, testified in the Keck case and that at bar as to the value of the omitted tracts. We need not, however, rely upon this in determining the value of the omitted portions. While it is true, as was said in the Keck case, that "we cannot know the exact values the city assessor would have given to the omitted parcels and so cannot ascertain exactly the amount that ought to be deducted from the bill in suit, nevertheless approximate accuracy can be attained and this is all that is required. Testimony can be introduced, including the City Assessor's, as to the value of those parcels and from that testimony the court can determine how much to abate from the bills." From the foregoing it will be seen that it is not necessary that the value of the omitted parcels be capable of exact mathematical calculation but, as this court has declared, it is only necessary that "approximate accuracy be attained." The similarity therefore, if not the identity, of the facts in the Keck and the instant case being apparent, the rule announced in the one cannot be held otherwise than as applicable in the other. A different construction would result in defeating the salutary purpose of the Charter (Sec. 24, Art. 8), which, while maintaining the integrity of special tax bills, results in no injustice to the owners of the same.

Not content with an examination of the facts in the Keck case and to show their similarity in all material matters to those in the instant case, the writer has examined the files and opinions in the cases cited by Judge Goode to determine the correctness of his conclusion in citing them in support of the rule announced in the Keck case. The cases referred to and which are cited by Judge Goode in the Keck case are as follows: Neil v. Ridge, 220 Mo. 233; Dickey v. Porter, 203 Mo. l. c. 29; Johnson v. Duer, 115 Mo. 366; Natl. Bank v. Nelson, 64 Mo. 418; Creamer v. McCune, 7 Mo. App. 91. No more definite data on which to base a calculation concerning the values of the omitted portions is to be found in several of these cases than in the case at bar. Whatever differences may be found in the facts in these cases, if enough appears from which the value of the omitted tracts may be ascertained the rule in the Keck case may be held applicable, that whenever land has been omitted from an assessment district that should have been included, the tax bills are not thereby rendered void; and where, as at bar, the charter gives ample author-

ity to correct such errors and evidence is available by which approximate accuracy in the amount of the reduction that should be made may be determined; the bills will not be held to be void, but will be reduced in the amount of the value of the omitted portions of the lands involved. It appearing, therefore, that portions of the lands in the special district in the case at bar have been omitted and it being shown that evidence on which to base their value is ascertainable, this bill should not be held void, but should be sustained and the reduction made.

The case at bar has been pending in this court since the January Call of the October term, 1923. In an opinion written by Judge WHITE, whose reasoning the writer has in the main adopted, a like conclusion to that announced herein was reached in regard to the application of the rule in the Keck case concerning the reduction from the amount of special tax bills of the value of lands omitted therefrom. Upon a rehearing the case was assigned to Judge OTTO. Judge BLAIR, in a subsequent opinion in Austin v. Dickey, not yet delivered, held to the contrary of Judge WHITE as to the application of the rule in the Keck case to that at bar, and the writer concurred in that holding. Upon a more careful examination of the records in these cases in the preparation of this opinion the writer is convinced that he was in error in his concurrence in Judge BLAIR's opinion and withdraws the same, and dissents from the conclusion reached therein in regard to the Keck case.

V. The benefit district, as laid out, is very unequal, being in places from 56 to 75 feet in depth on the west side, and from 275 to 290 feet at opposite points on the east side where the lot in suit is situated and where the land is less valuable. Station Park belongs to the city. Section 26, Article 8, of the Charter provides that city lands shall be charged their proportion of the cost of public improvements, so the fact that the park belongs to the city does not affect the question here. The charter provides that the property charged with the cost of the improvement, wherever it is not laid off in lots and blocks, shall extend back 150 feet from the street graded. The question here is whether at the time this property was charged with the cost of the improvement the tract marked "Station Park," was laid off in lots and blocks. The city plat shows original platted additions which the appellants claim justified the western lines of the benefit district. Respondent, for two reasons, claims that the Station Park tract was not laid off in lots and blocks, because: First, the evidence does not show that territory was ever laid off "in blocks," within the meaning of the charter; second, such blocks as might have been laid off had been, in effect, vacated by being appropriated by the city

and used as a park tract regardless of any previous street and alley lines.

In the first place it may be said that a block may be laid out in such an arbitrary manner that an ordinance enacted in pursuance of it would be in violation of the Constitution, and that the definition of the term "block," as applied to the situation, must be reasonable so as to avoid unequal and unjustifiable imposition of the burden of the improvement. It was so held by this court in the case of Commerce Trust Company v. Blakely, 274 Mo. 1. c. 58-59.

What is meant by the term "laid off," in lots and blocks, as the expression is used in the charter? We find many cases in which the expression "laid out" is defined, but it is difficult to find any case defining the expression "laid off." According to the ordinary understanding of words these expressions mean about the same thing. Bouvier defines "laid out," applied to a highway, as: "Embracing all the series of acts necessary to complete the establishment of a highway." The Supreme Court of Washington (Meacham v. City of Seattle, 45 Wash. 1. c. 386) defined the words "laid out" as synonymous with "laid off" when applied to streets, alleys and highways, and held that it meant not only that a highway was platted, but that it was surveyed, measured and marked upon the ground.

It was said by the Supreme Court of Connecticut, in the case of Town of Wolcott v. Pond, 19 Conn. 1. c. 602, that the expression "laid out" embraced all the measures for the creating or establishing of the way.

The Supreme Court of Illinois, in the case of Chicago Pressed Brick Co. v. City of Chicago, 138 Ill. 1. c. 633, said: "The words 'laid out according to law' have a well-known meaning under our statutes, and plainly include the doing of those things by the proper local officers which are essential in creating a public highway, to authorize it to be worked and traveled, and especially the surveying, marking the courses and boundaries, and ordering it established as a highway."

The record as to the status of the tract known as "Station Park," and Tract C, is as follows:

In 1909 an ordinance was passed by the City Council of Kansas City and approved by popular vote, providing that the Kansas City Terminal Company should purchase and transfer to the city the tract of land comprising the Station Park upon the condition that the lands acquired by the city in that manner should be maintained and improved as a park without expense to the Terminal Company, if said Terminal Company would maintain and operate a Union Passenger Station adjacent to the tract. The city by that ordinance consented to grade the property, within twelve years, in a manner approved by the Board of Park Commissioners; provided, that no

buildings should be erected thereon, no street car lines constructed nor operated on the property, nor any public carriages or automobiles allowed to stand thereon without the consent of the Kansas City Terminal Association.

An ordinance was passed by the City Council, and approved October 28, 1913, accepting a · deed from the Kansas City Terminal Railway Company for the land; this deed, executed October 25, 1913, conveyed the land, excepting, however, so much of the tract "as has been heretofore dedicated or condemned for public use as streets, alleys, etc." The deed contains restrictions as to street car lines, carriages, etc., as provided in the first ordinance mentioned. By ordinance approved May 7, 1915, the tract was named "Station Park."

All of these transactions took place before the tax bills were issued, and before the property in the benefit district was assessed to pay for the improvements. The respondent introduced also a resolution passed December 28, 1915, providing for the construction of curbs on the sides of the macadam highway in Station Park from 25th Street to Wyandotte Street. Also a resolution was passed November 13, 1916, providing for the grading of Station Park; also an ordinance approving a contract for the improvement of Station Park at a cost of $67,000, or more. These were objected to on the ground that they were passed after the improvement in this case had been accepted and the property assessed for the purpose of paying for it. They were not admissible for the purpose of showing the condition of the park, but they were admissible to show the purpose for which the ground constituting the park was taken over by the city. Evidence was introduced tending to show that the city had taken possession of the park under the conveyance. Mr. Wolf, a real estate man acquainted with the situation, testified that improvement of the park had been under way for about ten years. Mr. McMillan, another witness for the respondent, testified that work on the park had been prosecuted for seven or eight years, and the city had spent $200,000 on it in the last five years. This evidence was given at the trial October 21, 1920, which would indicate that work had been done on the park from 1912 to 1913. Mr. McMillan further testified "they (meaning the city) have been carrying on some work there practically all the time since they got it." That is, since October, 1913. There was no evidence offered by the appellant to contradict this testimony. It indicates that the city had taken possession of that tract at the time it was conveyed, and was improving it regardless of any supposed streets or alleys.

As mentioned above, Station Park includes a part of Tract C, while a part of that tract extends south to 25th Street. A short street, twenty-five feet wide, included in the west side of Tract C, is marked on the plat, "Platted as Main Street." Baltimore Ave-

nue is also shown on the plat as running through Station Park. There was evidence that the short section of the twenty-five-foot street, platted as Main Street, in Tract C, was not accessible from any other street to the west short of Wyandotte Street. There was no feasible grade by which any street between that tract and Wyandotte Street could be used. That would indicate that Baltimore Avenue was not used or usable. The evidence further shows that the Park property was used as a park as far west as Wyandotte Street. Mr. McMillan testified that for six or seven years there had been nothing on the ground in that tract called Station Park to indicate any opened, platted, or used street or alley.

Other evidence indicated that the only streets used for access to the property before the grading of Main Street, were Grand Avenue on the east and Wyandotte Street on the west. There was no attempt on the part of the defendant to show that Baltimore Avenue, or any alleys marked on the plat in Station Park, had ever been marked out on the ground, worked by the city, improved in any manner, or recognized as being highways. There was affirmative evidence to the contrary. The same is true of the little twenty-five-foot street on the west of the benefit district platted as Main Street. There was other evidence to show that before the opening of Main Street, the property to the west of that street depended upon Grand Avenue for a usable grade, and that Wyandotte Street was the first street to the west.

A block, as decided by this court in the Blakely case, supra, must be surrounded on at least three sides by streets. A street is not a street simply because it is indicated on a plat; it must be marked on the ground.

Section 3, page 315, Article 8, of the Charter, provides that the City Council shall determine, and its determination shall be conclusive upon the parties, of any question on the part of the City Assessor or Board of Public Works as to whether a tract fronting on the property to be improved is laid off in lots or blocks. Whether that provision could be given full effect as to the conclusiveness of such determination in this case we need not inquire. It is not claimed by the appellant that there was any such question or any such determination, and we shall not assume from the mere issuance of the tax bills and the laying off of the district that any such question was determined.

This is a bill in equity and we are required to examine the evidence and determine the facts at issue where the evidence clearly establishes any facts. We therefore hold that the benefit district should have included a strip 150 feet wide along the west side of Main Street, in the tract known as "Station Park," and that the west boundary line of the district as extended from the south should

have continued north until it reached the Station Park tract, so as to include all of Tract C not already included in Station Park.

The evidence shows that the total value of the property assessed for the improvement, was $753,115; that the contract price for the work was $178,642.27. Evidence was introduced by the respondent to show that Tract A, a portion of the Park, was worth from $120,000 to $140,000, and that 150 feet off the east side of the park, which would include Tract A, was worth from $268,000 to $425,000. The lots in Tract C to the south were estimated at $100 a foot. Of course we have not the Assessor's valuation of these tracts; we have only the estimated value of real estate men, but the evidence shows, if the benefit district had been laid out as it should have been laid out, it would have decreased by almost half the burdens of the lot owners on the east.

VI. The total amount of dirt excavated was 148,135 cubic yards. In addition to that, after the excavation was complete and during its progress, 17,846 cubic yards, designated as "enforced slides," were removed. This was charged for, and the charge allowed, at the rate of two dollars per yard. It was claimed by the respondent that there was no authority to charge this cost against the property owners; and, further, that if it was authorized, the contract would not permit a charge in excess of 96½ cents, per cubic yard as provided in the contract. In relation to those matters the contract provides:

"4. Any work not herein specified, which may be fairly implied or included in this contract, of which the Engineer shall be the judge, shall be done by the first party, without extra charge.

"The first party shall also do such extra work, in connection with this contract, as the Engineer may specially direct, and if it shall be of a kind for which no price is stated in this contract such price shall be fixed by the Engineer, but no claim for extra work shall be allowed unless the same was done in pursuance of special orders, as aforesaid, and the claims presented as soon as practicable after the work is done and before the final estimate. . . .

"There will be no classification of materials on this work and all materials excavated of whatever nature, earth, shale, rock or other material, shall be paid for at the price bid for excavating materials. Bidders must carefully examine the site of the work, as the price bid shall be in full payment for all necessary excavation.

"Side slopes in excavation will be vertical, where the excavation is carried to the property line. In all other cases side slopes will have an inclination of one and one-quarter feet horizontal to one foot vertical. All material, however, which may slide or fall into the street or alley from the sides of the excavation prior to the final

acceptance of the work, shall be removed and estimated as part of the material to be paid for."

The City. Engineer, November 14, 1914, directed the contractor to make certain excavations and slope back the banks on Main Street "as per instructions given." March 3, 1915, the City Engineer addressed a letter to the contractor ordering him to take down overhanging corners of rock, ledges, shale and earth in danger of falling, saying it would have to be taken down before the roadway was safe. The record of the Board of Public Works shows that this action of the City Engineer and his estimate of the value of the work done in removing the forced slides at two dollars per cubic yard was duly approved.

The above stipulations in the contract suggest an interesting speculation: What is meant by "extras," and what is meant by "work implied or included in this contract?" Since the contract provides for extras, in a certain sense extras are included in the contract, and nothing could be excluded from the contract which the engineer sees fit to declare is implied within its terms.

The contract must be construed reasonably so as to give effect to the intention of the contracting parties. Apparently it was this: the price of 96½ cents per cubic yard was fixed for all work that came within the letter of the contract as the plans and specifications showed the work to be done, and for any work not included within the letter of the contract which the engineer should say was implied by its terms. [American Contracting Co. v. Norton, Head & Denneen, 253 S. W. 372.] If any work outside those plans and specifications, express or implied, should appear to be necessary for the proper completion of the improvement, it should be deemed an extra. The engineer had authority to decide what was extra work and whether it should be done. His direction that it should be done was conclusive of its necessity. He also could fix the compensation for such work as he deemed extra. This is the only way to construe the contract so as to give effect to all of its terms. The ordering by the engineer of the work to be done and his fixing of the compensation for it, with the approval of the Board of Public Works, showed that in his judgment it was not within the express terms of the contract nor to be fairly implied from the contract requirement, but was an extra as contemplated by the contract.

There is evidence that earth and rock fell into the cut, while work was in progress. That, under the express terms of the contract, could not be called extra work, for the contract provides that such slides shall be removed for the same compensation as the other excavation. The evidence, however, shows that work was not included in what was termed the removal of forced slides. As explained by the contractor, the forced slides were of such material as on inspection

was found to be dangerous and in the future likely to slide into the cut, thereby rendering the street dangerous. They were called "forced slides" because instead of waiting for them to fall they were taken down. The contractor explained the unusual difficulty of taking down the banks, as required of him by the engineer. It is clear that this extra work was contemplated by the parties to the contract and properly chargeable as part of the improvements.

VII. The respondent cites authorities in support of his argument that the omission, from the assessed district, of property which should have been included in it, nullifies the tax bill. This court has decided, however, in the case of Commerce Trust Co. v. Keck, supra, that the remedy for that irregularity is abatement from the face of the tax bill of an amount in proportion to value of the omitted tracts. In that case Judge GOODE points out that the authorities cited by the plaintiff are not in point, because of the particular provisions of the Kansas City Charter to the effect that nothing in the tax bill shall prevent a defendant in a suit on it from pleading and proving, in the reduction of the bill, any mistake or error in the amount thereof (Sec. 24, Art. 8, p. 337, Kansas City Charter). This matter is fully discussed by Judge GOODE (283 Mo. 234-235) and, as we have shown, cases are cited in support of his position. The appellant, Dickey, in the instant case, in his answer, asks affirmative relief in the alternative, praying if there is any error in the amount of the tax bill, that the court determine the true amount and render judgment in accordance with such finding.

VIII. Subsequent to the preparation and submission of the foregoing opinion to the members of the court, Judge ATWOOD submitted a concurring opinion in which relevant issues not included in the foregoing are presented and determined. Finding no conflict between his reasoning and conclusions to those heretofore considered, his opinion is added as supplemental to what the writer has heretofore said on this subject, as follows:

"In his motion for rehearing respondent presents the following proposition: 'A correct, legal assessment and charge by the Board of Public Works, if the language and dictates of the City Charter are to be our guide, is *sine qua non* to a valid tax bill for the grading of Main Street. To that end a reassessment is provided for.'

"The provision for reassessment appears in Section 27, Article 8, of the 1908 Charter of Kansas City, as follows (italics ours):

" 'Whenever the city, by a valid ordinance, shall have authorized the making of any public improvement to be paid for in special tax

bills and shall have entered into a valid contract for such improvement, and shall have attempted to levy an assessment or issue a special tax bill to pay the cost thereof, and said contract shall have been faithfully and fully performed by the contractor, *and it shall be made to appear by a judgment of the court of competent jurisdiction or otherwise, that the lien of such assessment or part thereof, or of any or all tax bills evidencing the same, is invalid* by reason of any omission, irregularity, defect or invalidity in the acts or proceedings of any of the municipal authorities of the city relating thereto, the Board of Public Works may, at any time within one year after the original issue of the tax bills, reassess any or all of the tracts of land subject to assessment to pay the cost of such improvement, according to the rule of assessment, and in the same manner and with the same effect and evidence the same by like tax bills as is provided in this article for such assessments in the first instance.'

"A reading of the above section discloses that it can be invoked only when 'the lien of such assessment or part thereof, or of any or all tax bills evidencing the same, is invalid,' and unless such invalidity 'is 'made to appear' the provisions of the following portion of Section 24 of Article 8 of the same charter are clearly applicable for the correction of 'any mistake or error in the amount of the bill:'

" 'Every tax bill shall, in any suit thereon, be prima-facie evidence of the validity of the bill, of the doing of the work and of the furnishing of the material charged for and of the liability of the land to the charges stated in the tax bill. *Provided*: That nothing in this section shall be so construed as to prevent any defendant from pleading and proving in reduction of any bill, any mistake or error in the amount thereof, or that the work therein mentioned was not done in a good and workmanlike manner; and *Provided, further*, that if any party shall plead any mistake or error in the amount of the bill or that the work was not done in a workmanlike manner, and that such party before the commencement of the suit, tendered to the contractor, or holder of the bill, the full value of the work done, and shall establish the same on the trial, the recovery shall only be for the amount so tendered and judgment for costs shall be rendered against the plaintiff. *Provided, further*, That if it shall be pleaded and proved that the work for which the bill was issued was not done according to the terms of the contract made by the contractor with the city, then the plaintiff or plaintiffs shall recover thereon only the actual value of the work done, if of any value, and if not of any value, the judgment shall be for the defendant. No suit on any tax bill shall be defeated or affected by an irregularity affecting any other bill, or matter rendering any other bill invalid in whole or in part,'

"It is apparent, therefore, that Section 27, providing for a reassessment by the Board of Public Works 'of the tracts of land subject to the assessment to pay the cost of such improvement,' is not an exclusive method of curing an 'omission, irregularity, defect or invalidity in the acts or proceedings of any of the municipal authorities of the city.' It is, in fact, not a cure for such omission, irregularity, defect, etc., but a method of making valid the lien of the assessment or the tax bill evidencing the same which has been 'made to appear' and is invalid. If no such invalidity has been made to appear there is no ground or cause for a reassessment, there is no room for the application of Section 27, and Section 24 applies. If, however, the lien of the assessment or tax bill is invalid, Section 24 is without application and Section 27 provides the only remedy.

"Respondent has made various attacks upon the validity of the tax bill in question which had been shown to be without merit in the foregoing discussion of this case. As there observed, the cases cited and principally relied upon deal with assessments where there was no legislative authority to correct errors. Respondent's ultimate position therefore is that Section 24 of Article 8 of the Charter is not applicable. In support of this position it is urged that in attempting to ascertain and fix the value of omitted tracts an element of great uncertainty is necessarily introduced because such determination could only be reached by and based upon the opinions of experts which would naturally vary. If we should adopt this view we would then and there write into Section 24 a new and strange exception to the effect that the section should only apply when the error sought to be corrected could be ascertained and computed with unvarying mathematical precision. This proposed construction appears to rest upon a restricted interpretation of certain language used by Judge Fox in Neil v. Ridge, 220 Mo. 233. The error in that case happened to be one that was 'susceptible of ascertainment to a mathematical certainty,' and, of course, was properly so characterized. The writer of the opinion also expressed the view that this charter provision 'embraces mistakes and errors of every character and nature which are susceptible of an absolute correct determination by the trial court,' but we do not understand that it thereby limited the broad scope of this charter provision to the particular kind of error there dealt with. An alleged mistake or error might call forth variant and conflicting testimony and still be 'susceptible of an absolute correct determination by the trial court.' Not only does the section fail to express such a limitation, but any implication of such is in terms clearly precluded, for the remedial language of the section even permits the defense that 'the work was not done in a workmanlike manner,' on which question of fact in each case there would naturally be much conflicting testimony.

"Another reason advanced against the application of Section 24 is that the reduction would probably be proportionately unequal in suits upon different tax bills. This is a corollary of the proposition last above advanced and may be answered in the same way, with the further observation that the provisions of Article 10 of the Missouri Constitution, with respect to equality and uniformity of taxation, do not apply to the law of special assessments. [Farrar v. City of St. Louis, 80 Mo. 379; Trust Co. v. Blakely, 274 Mo. 52.]

"It is also generally urged that to permit the courts to fix the value of lands improperly omitted from the benefit district is to substitute the judgment of the court or jury for the charter method of determining and assessing the special tax. A complete answer to this argument is the fact that when done pursuant to the highly remedial provisions of Section 24 of Article 8 of the City Charter a fixing of the value of erroneously omitted tracts is not any exercise of the taxing power. The omitted tracts are not taxed, nor are the included tracts thereby taxed. The taxing power having been previously exercised, exhausted and consummated in the issuance of the special tax bills, the only purpose, virtue or effect of fixing the value of the omitted tracts is to reduce the amount of such tax bills as are met with the defenses permitted by this charter provision. The dignity of the charter provision fixing the mode of ascertaining in the first instance the value of the tracts included in the benefit district rises no higher than that of the charter provision permitting these defenses. In Neil v. Ridge, 220 Mo. 1. c. 250, this same objection was raised and held adequately met by the existence of the same charter provision for correcting a mistake or error in the amount of the tax bill. In that case (1. c. 243) we refused to sanction the principle that the erroneous omission of area from a benefit district would nullify tax bills issued in a proceeding otherwise regular. In this case it would be an over-technical and unreasonable construction of Section 24 of Article 8 of the charter to hold that the charter framers did not intend to give full force and effect to its broad, unrestricted terms. The erroneous omission of area from a benefit district, regardless of the basis or method of assessment, is an error very frequently made, and it seems inconceivable that such an error as occurred in this case was not contemplated or was intended to be excepted from this charter provision. I think our ruling on this point in Commerce Trust Co. v. Keck, 283 Mo. 209, is sound and should be followed in this case.

"In his motion for rehearing respondent insists that this case comes to us as 'an equity case pure and simple,' and that it should not be remanded to be further dealt with in effect as an action at law on the tax bill. Defendant Dickey went to trial on his amended answer which contained, among other things, the following specific pleading and prayer:

224

" 'And this defendant further alleges that if the officials of Kansas City in the determination of the boundaries of the district to be taxed with the cost of said work, have made any error, that this court has the power and it is its duty to correct the same upon proper evidence. And this defendant hereby asks the court to consider all proper evidence and to make such finding as the facts require. . . .

" 'Wherefore, defendant asks that plaintiff's petition be dismissed with costs; or that if the court finds that any error has been made in the amount of said special tax bill against the lot of plaintiff, that this court find and determine the true amount of said tax bill as authorized by law and to render a judgment in accordance with such finding; and defendant asks for such other and further relief as to the court may seem proper.'

"Furthermore, at the trial plaintiff, and defendants as well, introduced evidence as to the value of the tracts of land alleged to have been erroneously omitted from the benefit district. On this state of the pleadings and evidence we deem it proper that the entire controversy be adjudicated in this proceeding. It is a well-established rule that where a court of equity once acquires jurisdiction of a cause it will retain it to do full and complete justice. [Holland v. Anderson, 38 Mo. 55.] And this, too, although the court may pass on a matter cognizable at law. [Paris v. Haley, 61 Mo. 543.]"

Inasmuch as the testimony as to value given at the trial pertained to tracts not necessarily coextensive with the land we now hold to have been erroneously omitted, it becomes necessary to reverse and remand the cause for such action as the trial court may deem proper to render and enter a judgment not inconsistent with our holding herein; and the trial court is directed to ascertain the value on June 8, 1915, of only that part of the east 150 feet of Station Park, and of that part of Tract C not included in Station Park, which were not in the original benefit district, and to add the values thus ascertained to the sum of $753,115 the value of the property included in the district, and render judgment for the appellant upon the tax bill for that proportion of the same which would remain after deducting a sum which bears to the amount of the tax bill the same proportion as the value of the omitted tracts bears to the value of all the property which should have been included in the benefit district added as above indicated. *White, Atwood, Ragland* and *Gantt, JJ.,* concur; *Blair, J.,* dissents; *Graves, J.,* not sitting.