ROCKHILL TENNIS CLUB OF KANSAS CITY v. WILLIAM VOLKER ET AL., Trustees of Nelson Estate, Appellants.—56 S. W. (2d) 9.

Division One, December 20, 1932.

*Wilson, Bundschu & Bailey* for appellants.

950

*Sebree, Jost & Sebree* for respondent.

*George Kingsley,* City Counselor, and *J. C. Petherbridge,* Assistant City Counselor, for Kansas City, *amicus curiae.*

STURGIS, C.—This suit is for the specific performance of a contract to convey real estate, something over three acres of land in Kansas City, part of the estate of the late William Rockhill Nelson, well known editor and philanthropist. The plaintiff, as its name indicates, is a tennis club organized and incorporated by a *pro forma* decree of the Circuit Court of Jackson County under our statutes relating to the incorporation of organizations for benevo-

lent, religious, scientific and educational purposes, now Article 10 of Chapter 32, Revised Statutes 1929, Sections 4996, et seq. The plaintiff desires to own this tract of land and maintain a club house, tennis court, seating facilities, etc., in connection with games of tennis, tournaments, etc., but asks to have the title vested in it in fee simple and without restrictions. The defendants are what are denominated university trustees, holding this land and much other property, real and personal, amounting to ten or twelve million dollars in trust under the will of William Rockhill Nelson, deceased, the ultimate object of the trust being the establishment and maintenance in Kansas City of a gallery of art for the delectation and enjoyment of the public.

Plaintiff's claim to this tract of land arose in this way: The original trustees of the Nelson estate were his wife, Ida H. Nelson, and daughter, Laura Nelson Kirkwood. The gallery of art was not to be established till after the death of such wife and daughter, they having a life estate and certain contingent interests in part of the property, and the will of William R. Nelson gave the trustees large powers in reference to the management, sale, and investment of the trust property, being in part, to-wit:

"Said trustees shall have the management and control of all the property of every kind and nature constituting said trust estate and may continue, conduct, and carry on for such length of time as they shall deem proper any business owned or that is being carried on by me at the time of my death; they shall pay all debts, expenses, and liabilities incurred by them in the management and control of said trust estate and collect all moneys owing at any time that are part of the trust estate; they may sell or lease at such times and on such terms as they think proper any property, real, personal, or mixed, that is at any time a part of the trust estate and execute contracts of sale, deeds of conveyances or leases for any property so sold or leased."

William R. Nelson died in 1915. The trustees qualified, and on December 31, 1915, gave a ten-year lease on the property in controversy covering the years 1916 to 1925 inclusive. Said lease provided for the payment of $100 per month rent by the lessee and contained, among other provisions, agreements not to sublet the premises without consent of the lessors; that the lands described and the improvements now thereon and those hereafter to be erected thereon shall, during the continuance of this lease, be used only for tennis, squash, and allied games; to keep the premises and improvements now or hereafter placed thereon in good repair, all such improvements to belong to the lessors at the termination or any forfeiture of the lease; the lessee is not required to, but is given the privilege to erect squash courts, a tool house, and seating stands about the championship courts,

but the squash courts and tool house are to be a continuation and extension of the tool house owned by the lessors and hereinbefore mentioned, and the seating stands shall be erected at the southwest corner of said tract; the lessee shall have the right to remodel the small house now on the premises in such way that the same shall be suitable for a club house, but before any improvements shall be made upon the premises, the plans and specifications thereof shall be submitted to and approved by the lessors in writing, and no improvement shall be made or erected until the plans and specifications for such improvement shall have been first submitted to and so approved by the lessors. This lease also contains the following option or purchasing clause, which is the basis of this suit, to-wit:

"During the continuance of this lease, should the lessee desire to purchase this property, it shall have the right and option to do so by paying to the lessors the then appraised value of the land described hereinbefore separate and apart from the improvements which may at that time be thereon. Such valuation shall be determined by three appraisers, one of whom shall be selected by the lessors, one of whom shall be selected by the lessee, and the third shall be selected by the two appraisers so selected by the lessors and by the lessee."

Under this lease the plaintiff tennis club took possession and used and improved the tract of land in question as a tennis court and club grounds, becoming perhaps the leading tennis club of Kansas City, numbering among its members men of large wealth and prominence. Before the expiration of this lease and on May 10, 1924, the surviving trustee, Laura Nelson Kirkwood, the wife, Ida H. Nelson, having died leaving the daughter as the sole surviving trustee in charge of the Nelson estate, executed the following extension of the lease, which was indorsed thereon, to-wit:

"May 10, 1924. By mutual consent this lease is hereby extended for a term of five years from January 1, 1926, to December 31, 1930.

Up until the time of this extension it seems nothing had been said or done by either party as to carrying out the option or purchasing clause of this lease. As this other original trustee, the daughter, Laura Nelson Kirkwood, who signed the extension of the lease, had also died before the present controversy and suit arose, it is not known whether or not she had in mind, when giving this extension of the lease, the giving also of an extension of the option to purchase. In any event, matters with reference to the tennis club went on as usual till about the first of the year 1928, when this question of the purchase of this tract of land by the tennis club became a matter of consideration and controversy by the respective parties, and, failing to reach an adjustment, culminated in this suit brought in April, 1929, and tried

in July, 1929. On such trial the judgment was for plaintiff decreeing specific performance, and defendants have appealed.

It should be said here that during the time of this lease and before the plaintiff tennis club actively asserted its election to purchase this land in 1928 under the option clause of its lease, matters of great and far reaching importance had developed and taken or were taking definite shape and form with reference to the trust estate of William R. Nelson, of which the plaintiff's tennis courts and ground was only a small part in value, but assumed large importance in carrying out what is called the "larger scheme" of the William Rockhill Nelson Art Gallery. The trust fund created by the will of William R. Nelson was to be used to the extent of the net income, amounting to about a half million dollars annually, in purchasing works of art or reproductions of same for exhibition in the gallery of art, but no building or site for same was designated or provided for therein, further than that same should permanently remain in Kansas City. Other trust funds were later provided for that purpose, particularly by the wife and daughter of William R. Nelson and by his son-in-law, Irvin Kirkwood, making a total of some three million dollars available for that purpose. Lot six of Rockhill Addition to Kansas City, consisting of about twenty acres, the old homestead of William R. Nelson, had been devised to his wife and daughter for life, with power of sale, and by mesne conveyances passed to and vested in the municipality of Kansas City as a site for the building to house the Nelson Art Gallery. The city had accepted this gift under an appropriate conveyance and ordinance insuring and protecting its use for that purpose. So that at the time this suit was instituted and tried it was definitely determined that the William Rockhill Nelson Art Gallery would be built on the twenty acres of land known as Oak Hall, and a building to house the art treasures to cost some two million, five hundred thousand dollars was provided for.

The Nelson trust estate, as we have noted, was vested in his wife and daughter as trustees so long as the survivor of them lived, but on the death of such survivor, which occurred in 1926, this trust devolved on three trustees, defendants herein, designated in the Nelson will as university trustees, selected and appointed by a board composed of the then presidents of the state universities of Missouri, Kansas, and Oklahoma. This board of trustees, the defendants herein, which is to have perpetual succession, appointed in the same manner, came into possession of the Nelson trust estate in 1926 and then entered upon the duties of managing the trust estate and seeing to it that the trust funds were actively used for the purposes designated in the Nelson will, to-wit, the purchase of works of art. Very naturally

and properly, these trustees consulted and cooperated with the trustees of the other trust estates whose funds were to be used in acquiring suitable grounds and buildings in which to house and display the treasures of art acquired by the funds of the Nelson estate.

At the time this site for the art gallery was selected, acquired, and vested in Kansas City, and the surveys, plans, and specifications, blue prints, models, etc., were being prepared, and the whole scheme and plant constructed on paper, the university trustees, as well as the trustees of the building fund, had no actual knowledge of the lease in question and certainly not of the option clause therein giving the plaintiff the right to purchase this tennis club tract. The lease had never been recorded and no copy was with the papers and records turned over to the university trustees on taking charge of the Nelson trust estate. These university trustees knew, of course, of the occupation and use of this land by the tennis club, but supposed from the small rental paid; and they acted on the theory, that it was so possessed and being used under a short term or a month to month tenancy. Such trustees and the trustees of the other allied trust estates were planning the buildings and grounds to be used and occupied for and in connection with the Nelson Gallery of Art to include the tennis club grounds, and they were greatly surprised and disturbed when they learned that plaintiff claimed the right to purchase this tract of ground under an option contract. They are not, however, claiming that they are not bound by any legal contract of the former trustees, nor are they in the attitude of repudiating any such valid contract, but they are acting as trustees of a public trust under a will which requires them to conserve and use the trust funds for the public purposes designated, and they have no right to dispose of any property except for the benefit of the trust estate in accomplishing its beneficent purpose.

We note here that the central and dominating idea in creating and carrying out the altruistic scheme of William R. Nelson and those aiding him in doing so, is that of beauty. This is to be reflected not only in the contents in the gallery of art, but in the buildings and grounds. The desire is to make the Nelson Gallery of Art, not only in the treasures there to be collected, but in the architecture of the buildings, its landscape setting, and whole surroundings, a harmonious unit of surpassing beauty. To this end the Mary Atkins Museum of Fine Arts, for which some eight hundred thousand dollars is available, is to be combined with the Nelson Art Gallery. Nearby is located the Kansas City Art Institute, a gift to the city for the benefit of the public. The Jewish Hospital, with ample grounds, is also located in that neighborhood, and it is planned that the Kansas City University will occupy an adjoining tract of sixty acres.

Without going into too much detail, it will suffice to say that Kansas City has recently condemned and taken for part of its park system the bed and valley of Brush Creek which extends east and west some distance to the south of the land already conveyed to the city for the site of the Nelson Art Gallery, and through and along this parkway will be one of the city boulevards. Something like an acre of the original tennis club grounds was included in this park condemnation. The defendants, university trustees, as well as the trustees of the other trusts mentioned as furnishing the funds for purchasing the grounds and providing suitable buildings, agree that it is highly desirable and will add much to the beauty of the project to extend the grounds south of the already acquired building site to the Brush' Creek Parkway, which extension would include the tennis club grounds in litigation, and construct thereon a "mirror lake." This proposed lake will be some thousand feet or more in length and the elevation of the art buildings will be such that same will be reflected or mirrored by the lake, making a picture more beautiful, if possible, than the art buildings themselves. All this foreground and approach to the gallery of art is to be graded and landscaped and adorned with walks, fountains, shrubs, and flowers.

All the evidence is to the effect that the inclusion of the tennis club grounds is essential to the carrying out of this plan of extending and beautifying the art gallery grounds and surroundings. No mirror lake can be constructed without it. The extension of the grounds and construction of the mirror lake has the unqualified approval not only of all the trustees of the various trusts, but of the city manager, superintendent of public buildings, and superintendent of the public parks of Kansas City. The eminent architect who formulated and drew the plans for the buildings and grounds of the art gallery made much study of the plans, buildings, and grounds of similar institutions both in this country and in Europe and stated that the inclusion of the additional grounds and this mirror lake would add immensely to the value and beauty of the project as a whole, and cited the Lincoln Memorial at Washington, D. C., and the palaces of Versailles and Luxembourg as exemplifying the beauty of mirror lakes.

J. C. Nichols, one of the defendant trustees, who was called to the stand, was characterized by the trial judge as a man of national repute and fame as a city planner and city builder, and he had been appointed by President Coolidge as one of the four men for planning the city of Washington, D. C. He testified that he had studied carefully the elevations and topography of the lands with reference to the plans for the site and grounds of the Nelson Gallery of Art, and said with reference to such plans that same could not be carried out at all unless the tennis club ground was included; that he had this

topography in mind while in Europe investigating the development of a number of gardens and grounds and layouts adjoining large public buildings to find parallels to the topography that we have in this particular ground; that in his judgment this larger plan developed by the architect was the proper one for the setting of this memorial; that it would be one of the most notable developments to be found in this country or Europe; that the differences in the elevations and the opportunity to develop the reflecting possibilities of the pool lend themselves magnificently to the contour of the land and to this plan; that the university trustees are in hearty accord with the other trustees in the development of the project. He further said that it was highly desirable in acquiring the balance of the land to carry out this plan that it be acquired in a friendly way without condemnation proceedings, so that it can be deeded to the city under similar restrictions to those contained in the conveyance of the already acquired grounds; that he had been very much concerned with their starting the construction of the museum, for which the plans were practically complete and which they hoped to start the construction of this fall, until they know how much land they are going to have to the south, because in his judgment it would have a bearing on the location of the gallery building itself and its elevations in order to give the proper perspective and distance, and particularly the reflecting possibilities of the pool similar to what they have at Lincoln Memorial in Washington, D. C.; that the additional land is not excessive in amount; that as a matter of fact it is unfortunate that there could not be more ground added; that in comparison with the land used for development of similar projects in other cities, in Cleveland, for example, or European cities, it is not an excessive amount of land, and in his judgment, by this use in developing the land, this will be sufficient land to allow a place for a natural history museum or historical museum, or music hall, or other related cultural buildings which should properly be grouped around a gallery of art and related types of buildings. "We were much surprised," he said, "to find that there had been an option clause in the lease as given originally. We had assumed, on account of the low rent we were receiving, that it was on a month to month basis. We, upon the advice of our counsel, however, when we were told that the option was not a legal one, and in fact this was our unanimous judgment that it certainly was not for the best interests of the estate to have the tennis club there permanently, we felt that under the obligations of the will and trust as imposed upon us under this will, we didn't have any other course to pursue but to do what we thought was for the best interests of the estate." Other facts may be noted later.

■ ■ ■ No question is raised as to the pleadings. One of the defenses raised by the answer is that plaintiff is a corporation only by virtue of a *pro forma* decree of the circuit court, and that plaintiff did not receive and does not have the power to own, acquire or buy the land sued for herein, and had no power to make a contract to buy said land or secure an option to purchase same; that such real estate was not and is not necessary to plaintiff for "assembly, library, laboratory or other rooms," and plaintiff is not entitled to relief in equity in enforcing specific performance of the contract sued on. This defense challenges the right of plaintiff to call on a court of equity to decree specific performance by defendants of the contract to sell and convey to plaintiff the three acres of land in question. It is alleged and shown that plaintiff is a corporation formed by decree of the circuit court under the provisions of Article 10, Chapter 32, R. S. 1929, Sections 4996, et seq. To form such a corporation it is only required that the persons holding the chief offices of the association submit to the circuit court the constitution or articles of agreement of the association, praying for a *pro forma* decree of incorporation, and, if and when such decree is granted and filed in the office of the Secretary of State, a certified copy of the same shall be issued, it becomes the charter of incorporation and without more the petitioners become a body corporate. We have, however, a provision of our State Constitution which limits to narrow bounds the power of the State to form corporations in this manner, and limits the legislative power in authorizing corporations to be so formed. Section 21 of Article 10, Constitution of Missouri, reads:

"No corporation, company, or association, other than those formed for benevolent, religious, scientific or educational purposes, shall be created or organized under the laws of this State, unless the persons named as corporators shall, at or before the filing of the articles of association or incorporation, pay into the State treasury fifty dollars for the first fifty thousand dollars or less of capital stock, and a further sum of five dollars for every additional ten thousand dollars of its capital stock. And no such corporation, company or association shall increase its capital stock without first paying into the treasury five dollars for every ten thousand dollars of increase: *Provided,* That nothing contained in this section shall be construed to prohibit the General Assembly from levying a further tax on the franchises of such corporation."

By the plain and positive terms of this section of the Constitution, no corporation can be formed in this State in the manner provided by the statutes mentioned, that is, without paying into the State treasury at least fifty dollars on its capital stock, except "those formed for benevolent, religious, scientific or educational purposes." There

is no pretense that plaintiff complied with this constitutional provision, and when a corporation is formed by a *pro forma* decree of the circuit court under the statutes mentioned, it is not contemplated that it shall do so. But it is equally imperative that the corporation so formed shall be of the kind permitted by this constitutional provision, that is, formed for either benevolent, religious, scientific or educational purposes. This constitutional provision curbs the power of the Legislature, and it was held in an early day that the Legislature had no power to declare a corporation to be of the class exempted from paying the corporation tax required for its formation unless it actually is of that class. Whether it is or not is a judicial question. State ex rel. v. McGrath, 95 Mo. 193, 197, 8 S. W. 425, where it is said that, "If, in point of fact, the corporation authorized by the act is not a corporation for benevolent purposes, the declaration of the legislature that it is a benevolent corporation does not make it so, any more than a legislative declaration that a horse is a cow would alter the fact and convert the horse into a cow. Such legislative legerdemain is to be condemned, not approved. The nature or character of corporations authorized to be created by the act of 1887 (or any other legislative act) is to be determined from the purpose to be accomplished and the business they are authorized to engage in."

It is true that the courts have given the words "benevolent, religious, scientific or educational," as used in the Constitution, a broad and liberal meaning, as shown by State ex rel. v. Lesueur, 99 Mo. 552, 557, 13 S. W. 237, where the court held that a society whose corporate charter declared its main purpose to be "the encouragement of debating, reading and literature," and incidentally the playing of tenpins, chess, checkers, and other lawful games, was essentially educational in purpose and rightfully incorporated under the statutes in question (two of the five judges dissenting), but the court was particular to say: "Section 21 of Article 10 of the constitution is plain. By it no association can be incorporated for any purpose other than for benevolent, religious, scientific and educational purposes, without the payment of the tax. . . . Now it is plain that the payment of the tax cannot be evaded by organizing a corporation under a law which makes no provision for stock. It is equally clear that the legislature has no power to authorize the evasion of the payment by allowing corporations to be organized under this benevolent law, as it is called, without a capital stock. . . . To give effect to the constitution, corporations, not falling within one of the four classes, must be organized, if at all, under some law providing for capital stock. In so far, therefore, as Section 2834 (R. S. 1889), undertakes to allow corporations to be created for other than benevo-

lent, religious, scientific or educational purposes, it is void." The statute mentioned, Section 2834, Revised Statutes 1889, which was thus declared void, provided that "any association formed for the purpose of establishing a gymnasium, or club house, or for promotin; boating, field sports, or other rational amusements, or for any other purpose not excluded by Section 2829, lawful in itself and not otherwise specially provided for, may also, by complying with Sections 2821 and 2822 (R. S. 1889, now Secs. 4996 and 4997, R. S. 1929), become a body corporate and politic, and under this article shall possess the rights and privileges and be subject to the limitations and requirements herein provided, so far as the same are applicable thereto." By this statute the Legislature attempted to authorize the incorporation of athletic clubs without payment of the incorporation fee of not less than fifty dollars required by the Constitution, but same was held unconstitutional for the reason that clubs formed for athletic purposes are not within the terms "benevolent, religious, scientific or educational purposes," as required by the Constitution. In consequence of this decision, this statute disappeared in the revision of 1899 and thereafter. [Fishing & Hunting Club v. Kessler. 252 Mo. 424, 435, 159 S. W. 1080.]

In State ex inf. v. Rod & Gun Club, 121 Mo. App. 364, the purpose of defendant club, as declared by its charter, was "to promote the physical development of its members, to educate and train them in athletics, field sports, and gymnastics, such as baseball, football, running, jumping, lifting, throwing, wrestling, bowling, vaulting, hunting, and fishing, and to engage in and take part in athletic contests, and make public exhibition of any of the above named gymnastics and field sports, and to obtain by written lease or privilege suitable grounds for a club house and gymnasium, and to engage in social intercourse with its members." The court said, in the course of its opinion, "that it is a grave question indeed, whether this charter on its face, reveals in its declaration of purpose, a proper object authorizing it to have and enjoy a corporate existence under the statutes mentioned, and thereby escape the incorporation tax mentioned in the constitutional provision referred to, so as to render it immune from successful attack in *quo warranto* by the Attorney-General as being unauthorized by the very law upon which it predicates for an existence."

In State ex rel. v. Men's Club, 178 Mo. App. 548, 564, the charter of the Business Men's Athletic Club, incorporated by *pro forma* decree of the circuit court under what is now Article 10 of Chapter 32 of our statute, provided by the second paragraph thereof that same was organized for the purpose of "providing for and giving to its members entertainment and lawful exhibition feats of strength,

agility, and activity; such as boxing, sparring, wrestling, basketball, and any and all other indoor sports and harmless games that may be acceptable and beneficial to its members." The court there held that an organization of that character and for that purpose was not for either benevolent, religious, scientific or educational purposes, and could not be properly so incorporated. The court said: "Considering the second paragraph, we hold that the purposes there stated are not a subject to be incorporated under Section 3432, Revised Statutes 1909, as a society formed for benevolent, religious, scientific, fraternal-beneficial or educational purposes; also, that the purposes set forth in that paragraph are not purposes that can be classed as incident to either of the other named objects. It is not claimed that this club is a religious or benevolent organization. . . . The only terms of the statute that are claimed to apply to the corporation now under consideration are 'educational and scientific.' . . . It seems clear to us that while athletic training, even in boxing, sparring or wrestling, may have some educational value to those trained therein; yet, the mere entertainment of its members with such athletic exhibitions is entirely foreign to the purposes outlined in this statute."

Our statute has added the words "fraternal-beneficial" to the terms used in the Constitution in defining what corporations may be formed by *pro forma* decree of the court without paying the incorporation fee prescribed by the Constitution, but we need not consider this provision at this time as the plaintiff clearly does not fall under that class.

The charter of the plaintiff tennis club states the purpose of the corporation to be "for the purpose of owning or leasing, establishing or maintaining a club house, tennis courts and facilities for other games, and necessary suitable and convenient grounds surrounding or in the vicinity thereof, and of obtaining and enjoying a place of common and friendly intercourse and of advancing by rational amusement the mental and bodily health of themselves and their associates." The purpose of the club is purely and clearly athletic and the incidental purpose of obtaining and enjoying a place of common and friendly intercourse and of advancing by rational amusement the mental and bodily health of the members is such only as grows out of and connected with games of tennis—an athletic sport pure and simple, as is fishing, hunting, baseball, golf, wrestling, boxing, etc. It is true that the incorporation of what are termed social clubs under this method of incorpration has been tolerated by the courts under what Judge WALKER, in State ex inf. v. Missouri Athletic and St. Louis Clubs, 261 Mo. 576, 170 S. W. 904, termed "judicial legislation or construction." In that case this was said: "The respondents were incorporated, as shown by the pleadings and agreed statement of facts,

under that article of the law of corporations of this State (Art. 10, chap. 33, R. S. 1909) providing for the formation of benevolent, religious, scientific, educational and miscellaneous associations. To the jurist their incorporation under either of these classifications might seem to do violence to the usual and well accepted meaning of the words; but judicial interpretation, which can and oftentimes does accomplish what derivation and usage cannot, has declared in State ex rel. v. Lesueur, 99 Mo. 552, that a social club, organized as these were, is included in one of the classes named, or may be incorporated under said Article 10 of Chapter 33, supra. . . . The subjects of incorporation enumerated are, as we have seen, benevolence, religion, science, and education, and while it is nowhere expressly contended by respondents that social clubs partake of the nature of either of these classes, their incorporation having been authorized under the ruling in State ex inf. v. Lesueur, supra, it is reasoned by analogy that they may do whatever tends to the public advantage in relation to any of the objects above enumerated. This argument proceeds upon the covert assumption, which is carefully avoided in express terms, that a social club is organized for one of the purposes expressly mentioned, which it will require no argument to prove in the case of respondents to be a sophism, although the right to a charter was recognized in the Lesueur case upon the ground that the applicant for corporate existence possessed educational features. Incidentally, and as a mere *dictum*, so far as the instant cases are concerned, may not the ruling in the Lesueur case be properly limited to the incorporation only of such social clubs as are shown by their articles to possess some of the features characteristic of the classes named?''

A reading of the Lesueur case, 99 Mo. 552, as we have seen, gives no sanction whatever to the incorporation of clubs for social or athletic purposes, under the statute in question, without payment of the incorporation fees required by our Constitution, but the majority opinion in that case went no further than to hold that when the chief purpose of the corporation is educational, the incidental purpose of social intercourse and playing games for amusement would not bar the incorporation.

We hold, therefore, that the plaintiff tennis club was and is not properly incorporated or possessed of the powers and franchises of a corporation, and should its corporate existence and franchise be called in question by the State by *quo warranto,* or in any proper proceeding, its incorporation should be declared void. ■ It is, however, the province of the State to call in question the right to exercise the powers of a corporation or to challenge and oust a corporation from its right to exist and function as such. This will not

ordinarily be done in a collateral proceeding, especially if at the instance of a private suitor. ■ In the present case defendants are asking no such remedy or relief, but merely challenge the right and power of plaintiff corporation to acquire and hold, and especially to enforce specific performance of a contract to have conveyed to it, the land in question. What we have said as to the method of plaintiff's incorporation and the only purpose for which such a corporation can exist and exercise its corporate powers has a vital bearing on the question we are considering of enforcing specific performance of the contract to have conveyed to it the land in question.

In this connection it is pointed out that by Section 5007, Revised Statutes 1929, "any corporation, the purposes whereof are included in Section 4999 hereof, may acquire and hold in its own name such real estate and buildings as may be necessary for *assembly, library, laboratory and other rooms* requisite for its purposes, and may receive income from such other rooms as may be requisite to the completeness of such buildings." This section contains the only authority for corporations authorized to be formed under the statute in question without payment of the incorporation fees required by Section 21, Article 10 of the Constitution, to acquire and hold real estate. The most that plaintiff can claim, therefore, is that it is a *de facto* corporation such as could properly be incorporated by a *pro forma* decree of court for benevolent, religious, scientific or educational purposes, and with the power to acquire and hold in its own name such real estate and buildings as is necessary for a corporation of that character to have for assembly, library, laboratory and other rooms requisite for its purpose, and not that it is an incorporated tennis club incorporated for athletic purposes and empowered to own and hold all the real estate reasonably necessary to carry on its athletic activities in providing and maintaining a club house, tool house, a dozen or more tennis courts, grand stands, private boxes, etc., to provide room and seating capacity to hold tennis exhibitions and tournaments. If so, a like power should be given to a *de facto* incorporated golf or baseball club, to say nothing of the more delectable pastime of hunting and fishing.

■ That plaintiff tennis club has not the power to enforce conveyance to it of the land in question is decided in Fishing & Hunting Club v. Kessler, 252 Mo. 424, 159 S. W. 1080. The plaintiff club in that case had been incorporated by a *pro forma* decree of the circuit court with a charter declaring that "the purposes of this corporation are benevolent, scientific and educational; they are to promote fish culture, to promote and facilitate fishing and hunting, boating, field sports and other rational amusements, and to promote and provide for intellectual recreation for its members and guests, and to acquire

or lease such lakes and lands and other property as are necessary for such purposes." The court pointed out that "incorporation under that statute is not authorized except for purposes benevolent, religious, scientific or educational. By Section 3433 of said Article 10, Revised Statutes 1909 (Sec. 5007, R. S. 1929), it is provided that any such corporation, when organized for the above purposes, 'may acquire and hold in its own name such real estate and buildings as may be necessary for *assembly, library, laboratory and other rooms* requisite for its purposes.'" That suit was to compel the defendant, who had acquired the title to some four hundred acres of land occupied by plaintiff under a lease for hunting and fishing purposes, while he was president and acting for the club, to convey the same to plaintiff, on the theory that he held the land as trustee for plaintiff. The court upheld this theory on the facts, but denied recovery of the land for the reason that plaintiff, incorporated as it was, was not empowered under such a charter as the circuit court had a right to grant to own and hold the land sued for. The court ruled: "The fact that respondent's articles of agreement enumerated purposes other than benevolent, religious, scientific or educational, could in no way operate to give it power to acquire real estate for such additional purposes. The reason why the Legislature thus limits the power of such corporations to acquire real estate becomes apparent when it is recalled that associations incorporating under this article are permitted to do so without making payment of the incorporation fees or taxes exacted of manufacturing and business corporations. If such corporations were given the power to acquire real estate without restriction, it might lead to many abuses, and many such corporations might become holders of large tracts of land, and operate for pecuniary benefit—a thing which the Legislature doubtless foresaw and undertook to prevent. The large tract of land in controversy here consists of portions fit for hunting and fishing purposes, and other portions suitable for agricultural purposes, and it was clearly not necessary that the corporation acquire the same for assembly, library, laboratory, etc., uses in connection with any benevolent, religious, scientific or educational purpose which it might have, and it was not therefore such as the respondent was empowered to acquire and hold."

There is no material difference between that case and this one. There, as here, an essentially athletic club with educational and scientific features merely ancillary, incorporated by a decree of the circuit court under the statutes mentioned, was asking a court of equity to compel conveyance to it of certain real estate. It can make no difference that in one case the plaintiff there based its suit on the enforcement of a trust and here on the enforcement of a contract.

The relief is denied in each case for want of power to maintain the action.

Nor do we think that the ruling in the Fishing & Hunting Club case, supra, is in any way impaired by the ruling in Helpers of the Holy Souls v. Law, 267 Mo. 667, 186 S. W. 718, where it was held that a society incorporated in this manner for *benevolent purposes,* as plaintiff was there held to be, could take and administer for charity a devise to it of land for benevolent purposes. The court noted the Hunting & Fishing Club case and said that "nothing ruled in that case bears upon the constitutional validity of the charter presented in the present record. . . . The theory (of that case) being that the corporation in question was not authorized to acquire that sort of property," and Judge GRAVES in his dissent, on the ground that plaintiff was shown to be a religious corporation, said: "If the circuit court in entering the *pro forma* decree attempted to and did organize a religious corporation, when it chartered respondent, then the act of such court was futile in view of the constitutional inhibitions, and respondent has no standing in this case."

The plaintiff here, as did plaintiff in Fishing & Hunting Club v. Kessler, 252 Mo. 424; 159 S. W. 1080, invokes the rule of law that where a defendant deals and contracts with a plaintiff as a corporation and in its corporate name, it cannot, when sued on such contract, interpose the defense of *ultra vires;* that only the State in its sovereign capacity can question the unwarranted exercise of corporate powers. This rule, however, has its limitations, one of which is that it does not apply in equity to suits for specific performance of *executory* contracts. As said by the court in the case just cited, "It is true that an unwarranted exercise of corporate power ordinarily cannot be questioned in a collateral or indirect way by an individual. A careful review of the authorities, however, discloses that this rule is applied to situations quite different from the present one. After the corporation has transgressed its powers and acquired the property, then the general rule above referred to prevails, but where, as here, the corporation *has not yet acquired the property,* a court of equity will not lend its aid and power to cause to be conveyed to the corporation that which by its charter law it is not permitted to hold, and such a defense is available to an interested individual." The cases there cited and quoted from, including two Missouri cases, uphold this theory.

In 3 Thompson on Corporations (2 Ed.) section 2393, the law is stated thus: "A corporation cannot compel the specific performance of a contract to convey land to it where it has no power to take real estate for the purpose stated in the contract; and in such case the owner of the land, or his heirs, may defend on the ground of the in-

capacity of the corporation. Generally where the corporation seeks the necessary aid of a court to perfect its title, then an interested individual may question the corporation's power to take the real estate. . . . A court of equity will not aid a corporation to acquire land where it is expressly or impliedly forbidden so to do either by law or by its charter."

In the recent case of Title Guranty Trust Co. v. Sessinghaus, 325 Mo. 420, 28 S. W. (2d) 1001, 1006, this court said: *"After the conveyance is consummated,* the doctrine of *ultra vires* cannot be invoked by either party, much less by third persons—except the State and perhaps sometimes the stockholders. Performance on one side will exclude that defense, especially where the other party has reaped the benefit thereof, if the transaction is not *malum in se* or *malum prohibitum."*

■ It is urged, however, that the contract sued on here, being an option to purchase land engrafted on a lease of the same, is an executed and not an executory contract. When we consider the purpose of this suit and the relief asked for, it hardly seems consistent with the idea that the contract is fully executed on either side. Certainly no conveyance of the land has been made to plaintiff, nor has any part of the purchase price been paid by it or even ascertained. The contract of lease may be said to have been fully performed, the rent being paid and the terms of the lease complied with, but not so of the option contract of purchase engrafted thereon, which is in most respects at least a separate and distinct contract. While a valid option contract to purchase land requires an independent consideration separate and apart from the purchase price to be paid for the land (Warren v. Castello, 109 Mo. 338, 19 S. W. 29), where such option is engrafted on or incorporated in the lease as part thereof, such lease supplies the necessary consideration for giving the option (25 R. C. L. 238), but the contract of purchase is otherwise a distinct contract. The performance of one is not performance or part performance of the other. The law as declared in 13 Corpus Juris 245, reads: "An executed contract is one where nothing remains to be done by either party. An executory contract is one in which a party binds himself to do or not to do a particular thing in the future. An executory contract conveys a chose in action; an executed contract, a chose in possession. A contract may be partly executed and partly executory, and may be executory as to one party and executed as to the other." In 27 Ruling Case Law, 346, it is said: "On the *exercise* of an option, though not before, an *executory* contract of sale arises." Under the title of "Contracts," 6 Ruling Case Law, section 9, page 590, this is said: "Another distinction between an executory and an executed contract is that the former requires affirmative action for

its establishment, but the latter remains in force until disaffirmed, the difference being that in the case of an executory contract the burden of proof is on the party seeking to enforce it, while in the case of an executed contract the promisor, if he appears as the actor, must sustain the burden of proof in order to set aside the arrangement." In Land v. Coffman, 50 Mo. 243, 255, the court said: "There is a manifest distinction between executory and executed contracts. While a party may not be compelled by a court of equity to carry a contract into specific execution, yet if he should *voluntarily make a deed,* it will be good to pass all his title." In 25 Ruling Case Law, 237, section 39, speaking of options involving real estate, it is said: "Such an option, when supported by a valuable consideration, cannot be withdrawn during the time stipulated for; and, upon acceptance within that time, it becomes an *executory contract* for the sale of land, which may be specifically enforced in a proper case."

The plaintiff cites and relies on Hunting & Fishing Club v. Hackmann, 172 Mo. App. 549, which was a suit for specific performance of a covenant of a lease on certain lands for fishing and hunting purposes to renew or extend same for a further term of years on or before the expiration of the first lease. The defense was that of *ultra vires* in that plaintiff, incorporated as it was by decree of the circuit court under the statute, now Article 10, Chapter 32, Revised Statutes 1929, had no power to take or hold a lease on the land in question. The validity of the existing lease was not questioned, but plaintiff asked to compel a renewal. The court denied the defense of *ultra vires* on the ground that the contract sued on to renew the lease was fully executed on the part of plaintiff in that it had paid the rent reserved in the existing lease and otherwise complied with its terms. Of course, a covenant to renew or extend a lease is somewhat different from a covenant or option to sell the land at a price fixed or to be fixed, but there is nevertheless two contracts involved requiring separate considerations and different times and manner of performance. The court, it seems to us, confused these separate contracts and considered the performance of one as performance of the other. The payment of the rent reserved in the existing and executed lease is in no way the payment of the rent required by the renewal lease nor of the purchase price to be paid on the exercise of an option to purchase. This case and the companion case of Hunting & Fishing Club v. Cottle, 172 Mo. App. 574, by the same court and judge, have been severely criticized in the annotations in L. R. A. 1917A, 756 to 758, and L. R. A. 1917B, 866, where this question is thoroughly considered and the cases reviewed. In the first annotation mentioned it is said: "From the universally accepted doctrine that an *ultra vires* contract cannot be enforced while it remains executory, it would seem to be a

necessary deduction that, if one of the parties withdraws from the contract after it has been performed on both sides during a portion of the period which it covers, such withdrawal cannot constitute a cause of action, for the simple reason that the unperformed residue of the contract is executory in its nature. . . . All the decisions of a contrary tenor were rendered by intermediate courts of review, and, having regard to the authorities already mentioned, they may safely be pronounced erroneous." And noting specifically the Missouri Appeals decision just mentioned, this is said: "It is submitted that the contract was essentially a divisible one, and that the sole remedy available for the refusal of the lessor to renew the lease was an action to recover that particular portion of the rent, if any there was, which represented the consideration paid for the option of obtaining a renewal." In the second annotation mentioned, L. R. A. 1917B, 823, this is said: "The doctrine that, 'by contracting with a corporation, the party contracting estops himself from disputing the power of the corporation to make such contract,' has been explicitly repudiated. The correctness of the position thus taken is indisputable, for it is the only one which can be reconciled with the *universally accepted theory* that no action can be maintained upon an *ultra vires* contract so long as it *remains executory.*" And at page 866 the Missouri Appeals decisions, supra, are mentioned and this is said: "The correctness of these decisions is at least open to controversy. They seem to be essentially inconsistent with the cases cited in section 3 of the monograph in L. R. A. 1917A, 737, which proceed upon the doctrine that no cause of action is created by a refusal to complete the performance of an *ultra vires* contract which has been partially executed. It is submitted that the analogy of those cases points clearly to the conclusion that the fact of the lessor's having received the whole of the rent for the original term did not involve the consequences deduced from it. They show that either party to an *ultra vires* lease or other contract, the performance of which extends over a definite period, is entitled to withdraw from it at any time, even though the consideration may have been fully paid until the withdrawal." Insofar as the Court of Appeals holds in the cases mentioned that a contract such as the one sued on here is an executed one and not executory, we decline to approve such holding.

In Bowman Dairy Co. v. Mooney, 41 Mo. App. 665, the plaintiff contracted to employ the defendant to carry on a business not allowed by its charter. Defendant worked a short time and then quit and the suit was to enforce performance of the contract. The court held the contract executory as to the unexpired portion of the time of employment, and said: "So long as such a contract is executory, that is, when it has not been fully performed by either party, the courts will

not sustain any kind of action based upon it. The reason is that the enforcement of such a contract would be against public policy, and in direct violation of law. [Citing Case v. Kelly, 133 U. S. 28.] . . . What we have said disposes of the objection that the defendant cannot avail himself of the plea of *ultra vires*. When the action is based on a contract, which is shown to be beyond the powers of the corporation, and which remains executory, we have found no case which goes to the extent of holding that the individual cannot allege the illegality of the contract in opposition to its enforcement."

There is another view of this case leading to a refusal to award specific performance of the contract here sued on. This is a case in equity and plaintiff is asking a court of equity to decree specific performance of a contract to convey land. All the cases hold that specific performance in such cases is not a matter of strict right, but rests in the sound discretion of the court. Such discretion must be exercised in view of the particular facts of each case. A court of equity is never compelled to render an inequitable decree, however plain and valid may be the contract sued on. He who seeks equity must be willing to do equity and to have equity done to him. Equity may require that a party accept damages in lieu of specific performance, and may refuse the equitable remedy of specific performance and remit the party asking it to an action at law for damages. Such discretion is not to be used capriciously, but soundly and sparingly, and only when it is clear that a wrong would be done to grant specific performance. As stated in 25 Ruling Case Law, 214, section 16, "A decree for the specific performance of a contract is not a matter of right, but rests in the sound discretion of the court. This discretion is not arbitrary or capricious but judicial, and is controlled by the established doctrines and settled principles of equity. The desired relief will be granted or withheld by the court upon a consideration of all the circumstances of each particular case, and no positive rule can be laid down by which the action of the court can be determined in all cases. . . . This latitude is implied in judicial statements that the granting of specific performance is an extraordinary power which is not to be exercised when in a given case it would be contrary to equity and justice to exercise it, and that it is discretionary with the court to grant or withhold specific performance in furtherance of justice or to prevent injustice." Specific performance of a contract will be denied in any case where such a decree would be inequitable under all the circumstances. [Hilgedick v. Northstine, 316 Mo. 333, 334, 289 S. W. 939; Brevator v. Creech, 186 Mo. 558, 572, 85 S. W. 527.] It may be refused where its enforcement would work a hardship on innocent third parties (McGinness v. Brodrick (Mo.), 192 S. W. 420), or where detrimental to public welfare. [36

Cyc. 620.] And, as stated in one of the cases relied on by plaintiff, Hunting & Fishing Club v. Cottle, supra, it may be denied even when no fraud or mistake appears, where to grant it would inflict such a burden or hardship on the defendant as would be inequitable and unjust. The doctrine is well stated in McCall v. Atchley, 256 Mo. 39, 164 S. W. 593, to-wit: "In every case where specific performance of a contract to convey land will result in 'a more complete and rounded justice than mere money damages,' equity will decree it, otherwise it will be withheld. . . . But the same discretion is exercised where the contract is fair in its terms, if its enforcement, from *subsequent events*, or even from *collateral circumstances*, would work hardship or injustice to either of the parties. . . . No positive rule can be laid down by which the action of the court can be determined in all cases. In general it may be said that the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; and that it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties." It is stated in Gibb v. McMahon, 9 Ont. L. Rep. 522, 4 A. & E. Annotated Cases, 952, that, "The courts are extremely careful in enforcing the specific performance of contracts by *trustees* for the sale of the lands of their *cestui que trust.*" In Real Estate Co. v. Spelbrink, 211 Mo. 671, 710, 111 S. W. 480, the majority opinion says: "And this court has held that a specific performance will not be decreed in case of fraud, mistake, or of hard and unconscionable bargains, or where the decree would produce injustice; and, generally, not in any case where such decree would be inequitable under all the circumstances." And in the minority opinion, the same rule is expressed thus: "It may be said that specific performance is somewhat of grace, i. e., the chancellor is entitled to exercise a discretion, he must seek equity and do it—not inequity—and hence, specific performance will not go as of course and as a mere hard and fast matter of absolute right."

One of the well-recognized instances in which specific performance of a contract will be refused is that its enforcement will be detrimental to the public. In 58 Corpus Juris, 899, the rule is stated to be: "The fact that the contract, although not illegal, is nevertheless detrimental to the public welfare is often a ground for refusing its enforcement in equity." In Pomeroy's Specific Performance of Contracts (3 Ed.) 464, section 181a, it is said that this ground of defense has assumed considerable importance in recent years. "The court may also consider the public inconvenience which would result from the enforcement of a contract. Thus, where a board of education made a contract to sell a tract of school ground, intending to purchase other lands for school purposes, but later decided to retain the land sold

for the purpose of erecting a schoolhouse thereon, specific performance was denied the vendee in view of the public interest involved. [Whitlow v. Board of Education, 108 Kan. 604.] For a like reason, specific performance may be refused of certain contracts between railroads and private parties, the enforcement of which would tend to render the operation of the railroad inefficient, dangerous, or expensive. (See cases cited.)''

In Pomeroy's Equity Jurisprudence, section 796, this is said: ''Specific performance not being an absolute right, the fact that enforcement would be of little or no benefit to the complainant, and a burden upon the defendant, is sufficient to constitute performance oppressive, and it will not be given. The disproportion between the burden upon the defendant and the gain to the plaintiff makes performance inequitable.''

In Ford v. Oregon Electric Ry. Co. (Ore.), 36 L. R. A. (N. S.) 358, it is held that, ''A railroad company, being a public service corporation, owes its first and highest duty to the public, and any agreement having a tendency to interfere, or which may interfere, with that duty, is against public policy, and should not be enforced in a suit in equity. . . . Where the consequence of enforcement of the contract is to inconvenience the public, the discretionary power of equity is exercised to refuse its aid.'' [This last sentence is quoted from Pomeroy's Equity Jurisprudence.]

In Seaboard Air Line Ry. Co. v. Atlanta, B. & C. Railroad Co., 35 Fed. (2d) 609 (C. C. A.), the court said: ''In the exercise of its discretion, a court of equity may refuse specific enforcement of a valid contract where, by granting that relief, a paramount public interest will or may be interfered with. . . . We think that in the circumstances disclosed there was warrant for the inference that a paramount public interest might be interfered with by granting the relief sought. This being so, the court's refusal to grant that relief was not reversible error.''

This case presents a strong appeal to a court of equity to deny specific performance. No private interests are involved so far as defendants are concerned. They are acting solely as trustees of a trust fund for a purely public purpose. The Nelson Gallery of Art and allied institutions are being erected purely for the benefit of the public. The site of this institution is already vested in the city and the title to the additional grounds, inclusive of the tract now in question, is to be vested in the same way. That the conveyance of this tract in fee to the plaintiff tennis club, with power to sell *ad libitum*, will seriously mar and hamper the plan of development of this gallery of art as a thing of beauty, is not denied. Kansas City has manifested its interest in this matter by asking and being allowed to file a brief

*amicus curiae* on defendants' behalf. Specific performance of this contract should have been denied..

Plaintiff is not, however, to be turned out of court without remedy. We could deny the relief prayed for and remit plaintiff to an action for damages, but it is a well-settled rule that when equity is rightfully possessed of a case, as here, it will not relinquish jurisdiction short of doing complete justice. [10 R. C. L. 370; 25 R. C. L. 341; Pomeroy's Specific Performance of Contracts, sec. 474; Munford v. Sheldon, 320 Mo. 1070, 9 S. W. (2d) 907, 911; Marston v. Catterlin, 290 Mo. 185, 193, 234 S. W. 816; Seested v. Dickey, 318 Mo. 192, 300 S. W. 1088, 1101.] "In certain cases a court of equity when unable to grant specific performance of a contract will not dismiss the bill, but will retain jurisdiction and award damages in place of such performance." [25 R. C. L. 345.] "In an action for the specific performance of a parol contract for the sale of land, where plaintiff fails to make out the contract or the acts of part performance with the high decree of proof required, the case may be retained to decree restitution of the purchase price or part thereof paid by him, and compensation for the improvements made in good faith upon the land." [36 Cyc. 751.] The reason of the rule is stated in 25 Ruling Case Law, 347, thus: "This rule rests upon the broad principle that it is against conscience that one man should be enriched to the injury and cost of another, induced by his own act. In such cases, to prevent injustice, compensation may be awarded for the improvements, and where a bill for specific performance of a parol agreement is denied because of failure to make out a proper case, it may be retained by a court of equity for this purpose, provided it appears that the purchaser went into possession and made valuable improvements on the land upon the faith of the contract and that he has no adequate remedy at law. In such cases where specific performance cannot be decreed, the court may decree the repayment of the purchase price and interest, together with the value of the improvements."

The pleadings in this case, while drawn primarily on the theory of specific performance, are broad enough to permit the court, in refusing specific performance, to ascertain and award damages for the improvements placed on the land by plaintiff. [Gibson v. Shull, 251 Mo. 480, 490, 158 S. W. 322; McLure v. Bank of Commerce, 252 Mo. 510, 518, 160 S. W. 1005.] In this case the evidence shows that plaintiff has made substantial and valuable improvements on the tract of land in question. A dozen or more tennis courts have been constructed, seating facilities provided, and a club house erected. There is no reason to hold that plaintiff did not make these improvements in good faith under its supposed valid option to purchase the

land. Plaintiff should be compensated to the extent that these permanent improvements have enhanced the value of the land sued for.

Some evidence was taken in the case as to the value of these improvements. This evidence was heard, however, because of its bearing on the question of plaintiff's right to specific performance, and the evidence goes to the actual cost of reproduction cost of the improvements rather than the increased value of the land by reason thereof. Most of the improvements were made on the land soon after the commencement of the ten-year lease, and the cost does not show the present value. The court in its preliminary findings as a basis for its decree for specific performance found the value of the improvements to be thirty thousand dollars, but does not find that same has added that much value to the land. If so, we think the value is excessive under the evidence as now presented by some ten thousand dollars. Following the precedent laid down in McLure v. Bank of Commerce, 252 Mo. 510, 524, 160 S. W. 1005, we will reverse and remand the case to the end that the issue of the increased value of the land by reason of the improvements may be more thoroughly tried, and that the new trial be confined to that issue. The pleadings may be amended, if desired, so as to present that issue more clearly.

The judgment is, therefore, reversed and the cause remanded to the circuit court with directions to retry the question of the increased value of the land for tennis club or other purposes, and to confine the new trial to that issue, and on ascertaining such value to enter judgment refusing specific performance of the contract sued on, but awarding plaintiff judgment for the ascertained value of such improvements, and for costs. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All of the judges concur.